[Civ. No. 26762. Second Dist., Div. One. May 29, 1963.]

CHRISTIAN H. BULOW, Plaintiff and Appellant, v. DAWN PATROL, Defendant and Respondent; TRUCK INSURANCE EXCHANGE, Intervener and Appellant.

Rose, Klein & Marias and Robert B. Steinberg for Plaintiff and Appellant.

Early, Maslach, Foran & Williams for Intervener and Appellant.

Carol G. Wynn for Defendant and Respondent.

WOOD, P. J.—This is an action for damages for personal injuries resulting from an attack by a dog which was owned by a guard-patrolman, who was employed by defendant Dawn Patrol.

In a jury trial, the verdict was for plaintiff for $15,000, and for the intervener (compensation insurance carrier for plaintiff's employer) for $7,986.27. Defendant's motions for judgment notwithstanding the verdict and for a new trial were granted. In the order granting a new trial (on the ground of error in instructing the jury), it was stated that the order would be effective only if the judgment notwithstanding the verdict is reversed.

Plaintiff and the intervener appeal from the judgment notwithstanding the verdict and from the order granting a new trial, and they contend that the court erred in granting the motions.

Plaintiff Bulow, aged 53 years, had been an employee of General Controls Company about five years. That company, which manufactured aircraft equipment, occupied a fence-enclosed area of several acres in Burbank. Defendant Dawn Patrol, pursuant to a contract with General Controls, was furnishing guard and patrol services for the protection of that plant. The guards were stationed at guard shacks at entrance gates of the premises, where they checked the identification of persons who came there. During approximately 45 minutes of each hour of the nighttime it was their further duty to patrol designated routes around and through various buildings.

Plaintiff Bulow, as such employee of General Controls, arrived at the plant about 3:30 or 4 a.m. each work day, in

order to get things ready for other employees who were to start the morning shift at 6 o'clock. No shift was working when he arrived there—the prior shift stopped working at midnight. In getting things ready for the die casters, he would use a tow motor and go throughout the plant and pick up die-casting rings and flats that were lying around in various places. Usually, when he arrived at the plant, he entered at gate No. 1, where a guard-patrolman was on duty. On Monday, August 24, 1959, when he arrived at that gate about 3:50 a.m., Mr. Hellebrandt, who performed similar work at the plant, was also at that gate, but the guard was not there and no light was on in the shack. Presumably, the guard was patrolling a route in the plant. The two men then went to gate No. 2 where a guard was present, parked their cars outside the enclosure, entered the premises through that gate, and walked a considerable distance to the die-casting department. The tow motor which Bulow intended to use that morning, to pick up the rings and flats, would not start, and he decided to go to the guard at gate No. 1 to get a key to a building where other tow motors were kept. On several other occasions, probably once or twice a week, he had gone to the guard at that gate to get the key. He proceeded to go there by walking on a cement or blacktop driveway which was about half a block (or 500 feet) long and 12 feet wide. At the sides of the driveway there were buildings. At that time of the morning, about 4:20 o'clock, it was dark. There were some electric lights on the buildings along the sides of the first half of the driveway, but there was no light along the last half of the driveway toward the guard shack. There was no light at or in the area of the guard shack—the guard had turned off the light at the shack because the night was hot and bugs were attracted to the light. As Bulow was walking along that driveway (or corridor between the buildings) he was not hurrying, and there was sufficient light to see where he was going until he came to the section of the driveway or corridor where the lights were out (the last half thereof—toward the shack). When he was in darkness at a place somewhere between 40 and 15 feet from the shack he heard a growl and a bark, and suddenly a large German shepherd dog (weighing about 50 pounds and about 3 feet high) leaped against Bulow's chest, knocked him backward and down, and caused his head to hit the cement pavement. Blood came from his nose, left ear, and lacerated scalp. The side of his head was numb and he was unconscious for a short time. The scalp laceration re-

quired 18 sutures. He sustained a basal skull fracture, and was hospitalized two weeks. He lost his senses of smell and taste, and there was a partial loss of hearing in his left ear.

Mr. Bulow did not see the dog, or any outline or part of it, before it leaped upon him.

The dog was owned by Wayne Bishop, the guard at gate No. 1, who was an employee of defendant Dawn Patrol. Bishop commenced his work at this plant on Saturday evening, two evenings prior to the incident herein. He had acquired the dog, as a gift, about two weeks previously from his former employer, the California Plant Protection Company which was engaged in the business of guarding business establishments during the nighttime. That company used German shepherd dogs for protection or guard purposes, and the dog involved here was one of six dogs owned by that company. According to Bishop's testimony, a guard employed by that company would take a dog with him, in an automobile, while making the rounds of inspection so that in case of trouble he would have the dog "to back him up"; that the dog involved here had had obedience training, and the former employer had tried to train and use him as a guard dog, but he was too friendly, and was not a good guard dog and would not attack, and for that reason the former employer got rid of him by giving him to Bishop; the former employer had had the dog about a week.

When Bishop went to the premises of General Controls on Saturday, August 22, at 6 p.m., to begin his work there he was met at gate No. 1 by Captain Russett, an employee of Dawn Patrol who was supervisor of its guards at the various plants which it was guarding. Russett met him for the purpose of showing him the rounds or routes he was to patrol and what he was to do. They went together and checked the various places that Bishop would be required to check on his rounds. Russett told him what to do in performing those duties, and he also gave him instructions regarding his work at the guard shack. Russett remained there about three hours and they made three rounds together. The first two rounds, which were referred to as "dry runs" or test runs, did not require as much time as a normal run. After they had made the dry runs (which had required a few minutes), Russett noticed the dog which was in Bishop's automobile that was on the premises outside the fence and near the guard shack. Russett testified that, before they commenced their third round, Bishop brought the dog inside the premises

(fence) and tied him to the water pipe by the guard shack; that when they returned from the third round (after approximately 40 minutes) the dog was on the premises; and that he (Russett) did not tell Bishop that he could not keep the dog on the premises. Russett told him that, as a guard, he would have keys to some of the buildings and that there would be occasions when employees of General Controls would approach him to get keys to buildings. He was also told that some of those employees would be coming in, and leaving, at various hours of the night, even though the regular shift was not working. Russett left there about 9 p.m.

Bishop testified that during the time he and Russett were making their rounds, the dog was cooped up in the car, and after they had completed their rounds, Bishop or Russett suggested that the dog be brought inside the fence and tied to the water faucet because the car was hot. In his deposition, Bishop said that he brought the dog out of the car, in the presence of Russett, before they made their rounds. At the trial he testified further that it was his recollection then that, during the time they were making their runs, the dog was outside the guard house and tied to the faucet; that each time they returned to the guard house (after making a round) the dog was there; that Russett did not tell him that he would not be allowed to keep the dog on the premises.

After Russett had left on that evening, Bishop took the dog with him while he was making the rounds during the remainder of the night. During those rounds the dog was at Bishop's side, but Bishop did not hold the leash which was on the dog. He had told the dog to "heel" and the dog stayed at his side. The next night (Sunday) Bishop returned there with the dog, and took the dog with him on the hourly rounds in the same manner that he had taken him the preceding night. While making the rounds with the dog, Bishop saw, at various times, the guard from gate No. 2 (also an employee of Dawn Patrol) who was also making rounds—their rounds overlapped at certain places. Bishop testified that, when he was a guard for his former employer (California Plant Protection Company), the purpose of using a dog there was for protective purposes and for aid in checking places in the nighttime, and in case of trouble he would have a dog to "back" him up.

About 3:45 a.m. on Monday, August 24, when Bishop returned to the guard shack from one of his rounds, he entered the shack and was proceeding to put a plaster on a blister

which was on his foot. At that time the lights of the shack were out, and the dog was outside the shack and not tied to anything, and Bishop was not watching him. While Bishop had his shoe off and was treating the blister, he heard some one call, ''Hey, hey.'' Bishop stood up, looked out the window, and saw Mr. Bulow lying on his back. According to Bishop's testimony, Bulow was about 15 feet from the shack. Bishop assisted him in going to a seat at the side of the shack, and then called an ambulance.

Mr. Hellebrandt, who had entered gate No. 2 that morning with Bulow, testified: That while he was in the die-casting building that morning, the guard, Mr. Bishop, came there and told him that Bulow had had an accident and wanted Hellebrandt to help him when the ambulance came. While they (Bishop and Hellebrandt) were walking to gate No. 1, Bishop said that the dog was not vicious, that it was ''trained to attack, but not to bite.'' He (witness) saw a pool of blood on the pavement about 15 yards from the guard shack. Later that morning, Bishop said that he had the dog on the premises for his own protection—that it was ''dark out there'' where he walked by the railroad track (the track was outside the east fence of the premises).

Mr. Webb, a witness called by plaintiff, testified: He had been employed by General Controls 10 years, and he was treasurer of the employees' recreation club. On Sunday, August 23, 1959, the club had had a picnic (outside the premises), and he and Mr. McGann, the president of the club, were returning coffee urns to the company's cafeteria. When they were at gate No. 1 about 9:30 p.m. on Sunday, in a pick-up truck, he (witness) saw a German shepherd dog walking ''loose'' on the premises near the gate. The guard came out, opened the gate, and told them to drive back to the cafeteria and wait in the truck until he got there. He told them to stay in the truck because the dog was not friendly. After they parked at the cafeteria and were out of the truck for the purpose of unloading the urns, the dog was barking and running down the driveway from gate No. 1. They jumped into the rear of the truck. The dog arrived at the truck far ahead of the guard, and circled the truck and jumped up on the rear portion of the truck fender, and was barking and making a kind of growl. The guard said that the dog had had obedience training and would not bite while the guard was with him. They did not get out of the truck again

before the guard came there. He (witness) had never seen a dog on the premises prior to that time.

Bulow and Hellebrandt testified that they had never seen a dog on the premises prior to that occasion; and that when they entered gate No. 2 that morning the guard there did not tell them that a dog was on the premises.

According to Bishop's testimony, the dog was a pet, was friendly with children, and was taken by him to the premises for companionship and not for protection.

The court properly instructed the jury that if it should find that Bishop was negligent and that his negligence was a proximate cause of injury to plaintiff, then it must decide whether at the time of his participation in the events proximately causing the accident he was acting as agent for Dawn Patrol and within the scope of his authority. That if the jury found that Bishop had no authority from Dawn Patrol to keep the dog on the premises or if at the time of the accident Bishop was not acting within the scope of his authority, then it must decide this issue in favor of Dawn Patrol; but if the jury found that Bishop did have such authority to keep the dog on the premises, or at the time was acting within the course and scope of his employment, then the verdict must be for plaintiff Bulow, if the jury had also found on the other issues in favor of Bulow.

■■ It is implied, of course, in the verdict for plaintiff Bulow, that the jury found that Bishop, the employee of Dawn Patrol, was guilty of negligence proximately causing the injury, and that he had authority to keep the dog on the premises, and that, at the time of the injury, he was acting within the course and scope of his employment. The judgment notwithstanding the verdict presents the question as to whether those findings are supported by substantial evidence. It was established that Bishop was the owner of the dog. There was evidence that he knew that the dog was one of several guard dogs which his former employer owned and used in the same kind of guard work which Bishop was performing for defendant Dawn Patrol. There was evidence that Bishop knew that the dog had been trained to attack; and that it was an unfriendly or dangerous dog which likely, in keeping with its guard-dog training, would attack a stranger unless its owner, Bishop, had immediate charge of it or it was restrained by a tied leash. Bishop had observed the dog, about six hours before this incident, while the dog was on the premises pursuing, barking and growling at, and jumping toward,

the men in the truck who had come onto the premises to return the coffee urns. On that occasion Bishop had warned them to stay in the truck at the cafeteria until he arrived there, because the dog was not friendly. There was evidence that he knew (from the instructions given to him by defendant's supervisor of guards) that persons who were working within the premises during the nighttime might approach his guard shack to obtain a key or to leave the premises. His primary business or only duty at the premises was to guard the persons and property therein, and to save such persons and property from harm from all sources, including harm from other persons and from animals. Bishop brought the dog, which he knew was dangerous in the respects above stated, onto the premises thereby creating a further hazard which would require his attention in order to protect employees who were working there. When plaintiff Bulow approached the dark guard shack in the darkness of the early morning to get a key, he was acting in the proper performance of his duties and had no reason to suspect that a guard dog was loose in the area of the guard shack. Bishop, upon returning from his 3 a.m. round, had turned off the light in the shack, entered it, and left the trained guard dog outside, out of his presence, and not tied to anything. As above indicated, by reason of instructions given by defendant's supervisor of guards, Bishop was chargeable with knowledge that an employee within the premises, such as Mr. Bulow, might come in the nighttime to the guard shack. There was substantial evidence to support the finding of the jury that Bishop was negligent and that his negligence was a proximate cause of the injury to plaintiff.

With respect to the finding that Bishop had authority to keep the dog on the premises, there was evidence that Captain Russett, the defendant's supervisor of guards, who installed Bishop as guard at these premises, remained there about three hours while instructing Bishop as to his duties, and he knew that the dog belonged to Bishop, and he saw Bishop tie the dog inside the premises where it remained tied while they made three rounds and that it was tied when he left about 9:30 p.m. There was evidence that Russett did not tell Bishop that he would not be allowed to keep the dog on the premises. There was substantial evidence to support the finding of the jury that Bishop had authority, from defendant, to keep the dog on the premises.

As above indicated, the primary business or only duty

of Bishop at the premises was to render guard or protection services. He took the trained German shepherd guard dog with him on every round he made in performing his duties as guard. It is apparent that the presence of that kind of dog would be of assistance to such a guard, and that the taking of such a dog on the rounds or the keeping of him at the guard shack would not be acts which were foreign or unrelated to the object or purpose of such employment. The jury could reasonably find under the circumstances herein that the dog was actually used as a guard dog to help Bishop in the performance of his duties as guard, and was not with him as a pet or merely for companionship. It does not appear that Russett, the supervisor for defendant, knew that the dog accompanied Bishop on the rounds, but it does appear that he knew that Bishop had brought a large German shepherd police dog inside the premises and tied him to a faucet near the guard shack, where the dog remained while Russett was present. It is apparent that the mere presence of such a dog at that place would be of assistance in performing the only work for which the guard was assigned to the premises. The injury occurred after the guard and the dog had returned to the guard shack from one of their rounds, and during the period between rounds, allotted for guard work at the shack. There was substantial evidence to support the implied finding that at the time of the accident Bishop, in keeping the dog on the premises under the circumstances herein, was acting within the course and scope of his employment.

A respect in which the case of *Baker* v. *Kinsey*, 38 Cal. 631 [99 Am. Dec. 438], cited by respondent Dawn Patrol, is distinguishable from the present case is that it does not appear, in the cited case, that the dog was used by the employee to assist him in performing services for the employer, who owned the toll bridge. In that case the employee was the toll collector, and it does not appear that he was a guard. It was stated therein that the testimony showed that the employee kept the dog at the bridge as a companion.

■ "A motion for judgment notwithstanding the verdict should be granted only if it appears from the evidence and the reasonable inferences therefrom, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict." (*Sparks* v. *Allen Northridge Market*, 176 Cal.App.2d 694, 699 [1 Cal.Rptr. 595].) ■ "The rules governing a motion for judgment notwithstanding the verdict are the same as those applicable

to the determination of a motion for a judgment of nonsuit and for a directed verdict." (*Ibid.*) ▉ In determining a motion for a judgment notwithstanding the verdict, the court must disregard conflicting evidence on behalf of the party against whom the verdict was rendered (the party making the motion), and must give to the evidence on behalf of the party in whose favor the verdict was rendered (the party opposing the motion) "all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence." (See *Reynolds* v. *Willson,* 51 Cal.2d 94, 99 [331 P.2d 48].) ▉ In the present case the court erred in rendering judgment notwithstanding the verdict.

▉ Appellant Bulow contends that the court erred in granting the motion for a new trial. The motion was granted on the sole ground of error in law in giving certain instructions to the jury. It was stipulated that the intervener, Truck Insurance Exchange, the compensation insurance carrier for General Controls, had expended under its insurance policy, at the direction of the Industrial Accident Commission, a total of $7,986.27, consisting of the following items: $2,436.37 for medical care of plaintiff; $1,790 for temporary disability; and $3,760 for permanent disability. Pursuant to a stipulation the court instructed the jury that said amounts had been paid, and that said amounts which were paid to plaintiff were not paid in consideration for any general damage which plaintiff now seeks compensation for in this action.

The court instructed the jury (Instruction 174) that if it should find that the intervener is entitled to a verdict the jury shall determine each of the following items of claimed detriment:

(174-F) "The reasonable value of the time lost, if any, from his employment by plaintiff Bulow since his injury wherein he has been unable to pursue his occupation. In determining this amount, you should consider evidence of said plaintiff's earning capacity, his earnings, and the manner in which he ordinarily occupied his time before the injury, and find what he was reasonably certain to have earned in the time lost had he not been disabled."

(174-N) "Such sum also as will compensate said plaintiff Bulow reasonably for whatever detriment, if any, he is reasonably certain to suffer in the future as a result of any loss of earning power caused by the injury in question.

"In fixing this amount you may consider what said plaintiff's health, physical ability and earning power were before the accident and what they are now, the nature and extent of his injuries, whether or not they are reasonably certain to be permanent, or if not permanent, the extent of their duration, all to the end of determining the effect of his injuries upon his future earning capacity and the present value of the loss so suffered.

"It has been stipulated by all parties hereto with respect to plaintiff's loss of earnings and loss of earning power, that the intervener Truck Insurance Exchange paid to plaintiff directly as a result of the accident in question the sum of $1,790.00 as indemnity for temporary disability and the sum of $3,760.00 as indemnity for permanent disability. Any award to the intervener for loss of earnings and loss of earning power by the plaintiff cannot exceed said sums."

The court also gave the following instruction:

"In the event that you find for the plaintiff and the intervener in this case and against the defendant, Dawn Patrol, it is the desire of the Court that you separately state upon the verdict forms, which will be given to you for this purpose, the amounts of damage that you find to have been suffered by intervener Truck Insurance Exchange, and the amount of damage you find to have been suffered by plaintiff Christian Bulow.

"In this connection in considering and making your finding upon the amount of damage suffered by the intervener you can only consider those amounts which have actually been expended by the intervener, and in your consideration and findings upon plaintiff Christian Bulow's damage, you must only consider the element of general damage upon which I previously instructed you."

The following instruction was also given:

(174-L) "If, under the court's instructions, you should find that said plaintiff Christian H. Bulow is entitled to a verdict, you will consider not only the elements of damage heretofore mentioned, but you will award him such sum as will compensate him reasonably for any pain, discomfort, fears, anxiety, and other mental and emotional distress, if any, suffered by him, and proximately resulting from the injury in question and for such like detriment, if any, as he is reasonably certain to suffer in the future from the same cause."

As stated in respondent's brief, it appears that the jury was directed to award to the intervener the amount of money which it had paid and also to award to the plaintiff Bulow an amount which would compensate him for loss of earnings and earning power without decreasing said amount by the awards made to the intervener for temporary and permanent disability payments.

The instructions so referred to were confusing. The court did not err in granting the motion for a new trial.

The judgment notwithstanding the verdict is reversed. The order granting the motion for a new trial is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied June 24, 1963, and the petition of intervener and appellant for a hearing by the Supreme Court was denied July 24, 1963.