[No. C002266. Third Dist. Nov. 16, 1990.]

MICHAEL BEAVERS et al., Plaintiffs and Appellants, v. ALLSTATE INSURANCE COMPANY et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV, and V.

COUNSEL

Marer, Marer & Schuck, Gerald Z. Marer, Alan G. Marer, John F. Schuck, Hansen, Boyd, Culhane & Mounier, John F. Mounier, Jr., Thomas W. Hiltachk and Linda Dankman for Plaintiffs and Appellants.

Orrick, Herrington & Sutcliffe, Robert E. Freitas, Kenneth C. Mennemeir, Martha Clark Lofgren, Eilleen M. Clavere, Donahue & Callaham and Jeffrey W. Lambert for Defendants and Appellants.

OPINION

**SPARKS, Acting P. J.**—In this appeal we consider whether the trial court is empowered under Code of Civil Procedure section 629 to grant a partial

judgment notwithstanding the verdict. We hold that it is and hence may properly grant a motion for judgment notwithstanding the verdict as to some but not all of the causes of action stated in the complaint.

A jury returned a verdict in favor of plaintiffs Michael and Linda Beavers awarding them $600,000 compensatory damages and $5 million punitive damages against defendants Allstate Insurance Company and J. H. Ferguson & Associates, Inc. The trial court granted a motion for judgment notwithstanding the verdict as to punitive damages and the causes of action for fraud by concealment and intentional infliction of emotional distress. The court granted a new trial on the ground of jury misconduct as to all remaining issues. Both sides appeal.

In their appeal the plaintiffs contend the trial court has no power to grant a partial judgment notwithstanding the verdict and in any event erred in granting it as to punitive damages, fraud by concealment, and the intentional infliction of emotional distress. They further contend the court erred in finding that juror misconduct occurred and that a new trial was warranted. Finally, they argue the court erroneously denied their motion to amend the complaint to allege liability for claims settlement practices.

In their cross-appeal the defendants contend that the court should have included causes of action for breach of the implied covenant of good faith and fair dealing and constructive fraud in the order granting judgment notwithstanding the verdict.

In the published portion of this opinion, we conclude that the power to grant judgment notwithstanding the verdict is not an "all or nothing" proposition. Thus, the trial court is authorized in appropriate cases, such as this one, to grant the motion as to some but not all of the issues or causes of action asserted in the complaint. In the unpublished part of the opinion we further conclude that the court correctly concluded that the evidence is legally insufficient to support the causes of action for fraud by concealment and the intentional infliction of emotional distress or to justify the award of punitive damages.

In the unpublished part we also conclude that the trial court's order granting a new trial on the ground of jury misconduct is well supported by the record; the refusal to allow plaintiffs to amend their complaint was a proper exercise of the court's discretion; and the evidence is legally insufficient to support causes of action for breach of the implied covenant of good faith and fair dealing and constructive fraud. Accordingly, we modify the court's order to include causes of action for breach of the implied

covenant of good faith and fair dealing and constructive fraud in the judgment notwithstanding the verdict. As modified, we shall affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Cast of Characters.*

Defendant Allstate Insurance Company (Allstate) is, as its name implies, an insurance company. It had no actual involvement in any of the transactions which gave rise to this litigation. However, several years after this dispute arose, and while the litigation was pending, Allstate merged with its subsidiary corporation, Northbrook Excess & Surplus Insurance Company (Northbrook), which was involved in the dispute. Plaintiffs were permitted to amend their complaint to name Allstate as the defendant and to proceed for purposes of both liability and measurement of damages, including punitive damages, as though Allstate had been a participant in the transactions which gave rise to the litigation.

Northbrook was the actual insurer involved with plaintiffs when this dispute arose. Northbrook was an excess and surplus insurance carrier admitted to do business in California. The transactions in dispute in this case fall into a speciality class of the insurance business. Although Northbrook was the insurer and bore the ultimate risk of loss on policies issued in its name, it did not personally participate in the transactions which gave rise to this litigation. In these transactions Northbrook acted through intermediaries.

Defendant J. H. Ferguson & Associates, Inc. (Ferguson), is an underwriting manager. In this position Ferguson underwrites, prices, handles claims, and provides statistical data to insurance companies in return for payment of certain fees. In this case Ferguson was the underwriting manager for Northbrook and as such was given the authority to produce and underwrite business for Northbrook. In order to produce business Ferguson would sign up producers. The producer involved in this case was Hull & Company (California), Inc. (Hull).

Hull is an insurance wholesaler involved in the sale of excess and surplus insurance coverage. In its business Hull deals with and acts for numerous insurance companies. In this instance Hull acted on behalf of Northbrook pursuant to an agreement with Ferguson. Hull's activities are limited to those of a wholesaler and consequently it does not deal directly with the insurance buying public. Hull provides a market for insurance brokers. It has placed insurance produced by as many as 1,500 insurance brokers. At

the time in question a significant portion of its business, 10 to 15 percent, was produced by Arlen Insurance Marketing (Arlen).

Arlen is the insurance broker that dealt with plaintiffs. Arlen was a specialty agency obtaining insurance for such clients as restaurants, bars, pawnbrokers and other classes of business which are difficult to place in the standard marketplace. In dealing with plaintiffs Arlen operated through its employee, insurance solicitor Joseph Farley. Farley was the individual who had direct contact with plaintiffs.

Union Bank is a lender that engages in premium financing. (Ins. Code, § 778 et seq.) Under a premium financing agreement a person seeking insurance would make a down payment and the remainder of the annual premium would be financed by the lender to be repaid in monthly installments. The lender would obtain an assignment which would allow it to request cancellation of the insurance policy in the event of nonpayment. The unearned premium which was refundable upon cancellation would serve as collateral for the loan.

Plaintiffs Michael and Linda Beavers are members of the insurance buying public. Their need for specialty insurance arose when they purchased Slick Willy's, a bar and restaurant in Sacramento.

2. *Setting the Stage.*

At some time, apparently in the late 1970's, Arlen approached Hull about establishing a market for the placement of insurance for bars, taverns and similar businesses. At that time Arlen had a market with S and H Insurance Company (S and H) for so-called preferred restaurant business insurance. However, to qualify for insurance with S and H a business had to meet certain underwriting guidelines, which included limitations upon such things as the amount of the business's alcohol receipts. Arlen was interested in establishing with Hull a program that would accept accounts for businesses which did not meet the S and H guidelines.

Hull negotiated agreements with a number of companies which would permit it to provide the specialty insurance sought by Arlen. These companies had different underwriting guidelines for the issuance of insurance policies. The program for bars, restaurants and taverns was negotiated with Ferguson on behalf of Northbrook.[1] With respect to insurance to be issued

---

[1] In fact, Hull's agreement with Northbrook permitted it to issue only certain types of insurance to bars and restaurants, such as premises, operations liability and business interruption insurance. If the insured desired additional types of coverage that coverage would be obtained through a different insurance company. In this case Arlen obtained insurance for

on behalf of Northbrook, Hull became Northbrook's managing general agent in California. This gave Hull the authority to accept business and issue policies on behalf of Northbrook in accordance with its underwriting guidelines.

Hull negotiated the bar insurance program with Ferguson on behalf of Northbrook at the behest of Arlen. Arlen did not have the exclusive right to solicit business under the program, but the majority, if not all, of the policies placed in the program were obtained by Arlen. Under this program Hull provided Arlen with underwriting guidelines which had to be met for issuance of a policy. Arlen would solicit business, obtain the appropriate information, and submit an application to Hull for issuance of a policy on behalf of Northbrook. Arlen was responsible for collecting the premium and forwarding it, less commission, to Hull. Hull had no direct contact with the insured. In fact, with the exception of cancellation notices, it was against Hull's policy to have direct contact with an insured.

When Arlen solicited business under the Northbrook bar program it would also arrange for premium financing if the client so desired. Under the program most of the business Arlen obtained was premium financed. Union Bank provided financing for at least some of the Arlen business. When Arlen arranged premium financing with Union Bank, the bank originally paid the financed premiums directly to the insurer with whom the policy was placed or to its managing general agent. In 1980, Arlen asked Union Bank to submit financed premiums to it rather than the insurers with whom polices were placed. The bank wrote to Hull to seek its approval for such an arrangement on behalf of the companies which Hull represented. In the letter the bank stated: "Payment to your agent will result in recognition by your company of our interest in any policy under the terms of our notice of financed premium." In August 1980, Hull agreed to the procedure.

At this time, which was shortly before plaintiffs became involved, there was a system in effect for the purchase and delivery of insurance from Northbrook to members of the insurance buying public. This system was designed to work as follows: An insurance broker, in this case Arlen, would contact potential clients to solicit business, gather the necessary underwriting information, and collect a down payment from the client. Arlen would submit the application and appropriate information to Hull and would obtain a policy number, which was necessary to arrange premium financing. Arlen would contact the bank to arrange premium financing for the client. Upon approval of financing the bank would remit to Arlen the amount of

plaintiffs with Northbrook and with Great Southwest Fire Insurance Company. Plaintiffs' loss and this litigation involve only Northbrook.

the premium less the down payment and a notice of financed premium in order to perfect its right to cancel the policy and receive the unearned premium in the event of nonpayment. The bank would submit to Hull a copy of the notice of financed premium. Arlen would remit to Hull the financed premium and the down payment, less its commission. The bank would send the clients a payment book and the clients would make their monthly payments to the bank.

Although this was the way the system was intended to operate, it did not work satisfactorily in practice. Richard Greenburg, Hull's controller at the time, testified that although Hull knew that most policies were premium financed, the bank was not submitting copies of the notice of financed premium to it. Richard Arlen Newby, the president of Arlen, testified that Arlen would not inform Hull when premiums were financed. Newby also testified that the system placed insurmountable time constraints upon Arlen. When Arlen would seek to obtain insurance for a client it would be required to submit an application for insurance to Hull and obtain a policy number before it could begin to arrange financing. Since the policy would be given an immediate effective date, the first payment often would be due before financing could be completed. In that case the bank would not consummate its premium financing arrangement until the payment was made. In such circumstances Arlen would make the first payment on behalf of the client and then bill the client for that amount. Newby also testified that Arlen would not remit any sum to Hull until it had the entire amount of the gross premium, including repayment of the first installment, in its possession. Hull would submit monthly billings to Arlen for amounts due. Although Hull knew the amounts due from Arlen for policies it sold, it did not know whether Arlen had actually received those sums.

By the end of 1980 Hull was becoming dissatisfied with Arlen. At that time Hull's account balance with Arlen was very high, meaning that Arlen was not remitting premiums to Hull in a timely manner. It also appeared that upon cancellation of a policy Arlen was not returning unearned premiums promptly. Eventually, sometime in the spring of 1981, Hull instructed the bank to pay financed premiums directly to it rather than to Arlen. Hull attempted to impose constraints upon Arlen for the handling of premiums. When Arlen could not or would not comply, Hull decided to cease doing business with Arlen.

With respect to the type of specialty insurance involved here, there was, at the time, no legal restriction which precluded the parties from agreeing that the policy could be cancelled at any time by either party without cause. (*Jensen* v. *Traders & General Ins. Co.* (1959) 52 Cal.2d 786, 790 [345 P.2d 1].) The policies issued by Hull on behalf of various insurers permitted

cancellation at Hull's election provided it sent notice to the insured's last known address. In the event of cancellation an insured would be entitled to a refund of unearned premium within a reasonable time. (Ins. Code, § 481.) Hull relied upon its right to cancel policies in order to terminate its relationship with Arlen. In April 1981, Hull engaged in a mass cancellation of all policies which had been obtained through Arlen. At that time Arlen began notifying its clients that it would place their insurance with other companies. Since the Hull policies were cancelled in midterm and the new policies were for full terms, in many instances Arlen's clients were required to make additional payments for the new coverage.

3. *The Plaintiffs.*

In 1980 plaintiffs Michael and Linda Beavers bought a restaurant/bar in Sacramento known as Slick Willy's.[2] At the time plaintiffs purchased the bar it was insured under a policy issued by Western World Insurance Company which was scheduled to expire in January 1981. In late 1980 Joseph Farley, an insurance solicitor from Arlen, met with plaintiffs about procuring replacement insurance. When Farley met with plaintiffs he prepared a quotation sheet which was signed by Michael Beavers. Among other things the agreement states: "Arlen Insurance Marketing and its representatives are providing and charging for these services: (1) Review of present coverages (2) Procurement of insurance as quoted (3) Monitoring and service of insurance program provided. Arlen is hereby appointed as representative, with respect to these services. Insurance may be cancelled by either party upon written notice . . . ."

Farley told plaintiffs that Arlen could obtain the type of insurance they needed and plaintiffs agreed to use Arlen as their broker. It was agreed that Arlen would obtain property insurance in the amount of $100,000 and business interruption insurance in the amount of $16,000. Arlen obtained insurance for plaintiffs from Northbrook through Hull with an effective date of January 31, 1981. On February 5, 1981, plaintiffs made a down payment of approximately $1,000 to Arlen. Arlen arranged financing for the remainder of the premium through Union Bank. By February 26, 1981, Union Bank paid the remainder of the premium to Arlen.

By the time the financing was arranged for plaintiffs' insurance premiums, the first installment payment had become due and Arlen had paid it. This payment by Arlen left plaintiffs owing Arlen $321.75. Arlen sent plaintiffs a bill for this sum, and advised them: "Since this is not a usual

---

[2] The plaintiffs bought the bar in partnership with Linda's brother, Thomas Newsom. Newsom is not a party to this litigation since, before their loss, the Beavers bought out his interest under justifiable circumstances.

practice to advance finance contract payments for insureds, we must ask for reimbursement upon receipt of this notice, payable to Arlen. Payment must be received to [sic] this office with this notice before 3/9/81." When plaintiffs failed to make this payment Arlen asked Hull to cancel the policy, stating: "Please cancel for non pay to Arlen $321.75."

On March 30, 1981, Hull prepared a notice of cancellation advising that plaintiffs' insurance was cancelled effective April 11, 1981, for nonpayment of premium. The notice was mailed to plaintiffs on March 31, 1981. Hull subsequently sent a policy endorsement reflecting cancellation and advising that the unearned premium to be returned was $2,695. At that time Arlen had not forwarded premiums to Hull on plaintiffs' behalf, so Hull did not make a refund to plaintiffs and instead told Arlen to do so. The unearned premium should have been paid to Union Bank pursuant to the premium financing agreement. The bank would be responsible for refunding to plaintiffs any balance after repayment of the insurance loan. Arlen, however, failed to make a refund to Union Bank. Instead, apparently through negligence, Arlen submitted the unearned premium to Imperial Bank. Eventually, after plaintiffs' loss, Arlen made a refund to Union Bank.

Although Hull sent a notice of cancellation and follow-up letter to plaintiffs, they claimed to have no recollection of having seen the communications. Regardless whether plaintiffs received or read the notices from Hull, the notices did effectively cancel their insurance. (*Jensen* v. *Traders & General Ins. Co., supra*, 52 Cal.2d at p. 791.) However, although they were quite late in doing so, plaintiffs did eventually make a payment to Arlen of the amount it was demanding. Upon receiving payment Arlen should have, but did not, request reinstatement of insurance by Hull. Since Hull did not receive a request for reinstatement, it allowed the cancellation of plaintiffs' insurance to become effective April 11, 1981.

The cancellation of plaintiffs' insurance occurred shortly before Hull began mass cancellation of Arlen-procured policies in order to cease doing business with Arlen. Plaintiffs were not part of the mass cancellation, since they had been cancelled earlier, but Arlen treated them as though they were. On April 7, 1981, Arlen sent plaintiffs a letter similar to that it was sending to all of its mass-cancelled clients. Among other things, the letter advised that the cancellation notice the client had received was the result of Arlen moving business from one company to another. It stated that the client's insurance would be replaced at an equal or lower cost and that in most cases an additional deposit would be required. In the letter to plaintiffs they were advised: "We can't rewrite until we receive $637.00." Plaintiffs did not recollect seeing this letter. At any rate, they did not reply to the letter and Arlen apparently dropped them as clients.

At this point it is easy, in retrospect, to see how plaintiffs were exposed to an uninsured loss. Hull had not been paid any amount on plaintiffs' account by Arlen. At about the time Arlen should have been forwarding premiums to Hull it instead requested cancellation for nonpayment. Hull was not advised that plaintiffs had paid their account and it was not otherwise requested to reinstate and it went ahead with cancellation. Plaintiffs claimed to have no recollection of seeing the notice of cancellation, but even if they did see it they eventually paid Arlen the amount it was owed and plaintiffs could reasonably assume that Arlen would take the necessary steps to obtain reinstatement. Arlen did not do so and Hull completed cancellation of the policy. At that time Arlen should have returned the unearned premium to Union Bank. In that event the bank would have ceased accepting plaintiffs' payments and they would have learned that their policy was cancelled. However, Arlen sent the unearned premium to the wrong bank with the result that Union Bank was unaware the policy had been cancelled and it continued to accept payments from plaintiffs.

In the early morning hours of July 29, 1981, Slick Willy's was destroyed by fire. Plaintiffs reported the loss to Arlen and were subsequently informed that they had no insurance.

### 4. *The Litigation.*

On November 6, 1981, plaintiffs filed a multiple cause of action complaint against Arlen and Joseph Farley. On October 30, 1984, a first amended complaint was filed to add Northbrook, Ferguson, Hull, Union Bank, and Richard Arlen Newby, Sr., as defendants. Shortly before trial plaintiffs were permitted to amend the complaint to name Allstate as defendant in place of Northbrook, in view of Allstate's merger of Northbrook into itself. As finally amended, the complaint alleged causes of action for wrongs described as negligence, conscious disregard and oppressive violation of duties owed to plaintiffs, breach of an unwritten contract, breach of written contracts, breach of the covenant of good faith and fair dealing, intentional misrepresentation, negligent misrepresentation, intentional infliction of emotional distress, negligent infliction of emotional distress, conspiracy to defraud and unfair practices. All defendants except Allstate and Ferguson settled prior to trial and were not parties to the trial. Allstate and Ferguson defended the action jointly and stipulated that judgment against one would be considered judgment against the other.

Immediately prior to trial plaintiffs attempted to amend their complaint to "clarify" the issues. The trial court held that it would not allow them to raise issues relating to postfire acts of the defendants or violations of Insurance Code section 790.03, subdivision (h). ■ ■ ■ ■ During trial the

court granted defendants' motions for directed verdicts on alleged causes of action for conspiracy,[3] fraud by affirmative misrepresentation, violations of Insurance Code sections 780 and 790.03, subdivision (b), breach of a financing agreement, and negligent misrepresentation. The case was submitted to the jury on theories of negligence, breach of an insurance contract, breach of the implied covenant of good faith and fair dealing, fraud by concealment, constructive fraud, and the negligent and/or intentional infliction of emotional distress. The jury returned a general verdict awarding plaintiffs compensatory damages of $600,000 and punitive damages of $5 million.

Defendants filed motions for a new trial and for judgment notwithstanding the verdict. The trial court granted the motion for judgment notwithstanding the verdict insofar as it related to punitive damages and to the causes of action for fraud by concealment and the intentional infliction of emotional distress. In the alternative, the court granted the motion for a new trial as to punitive damages for insufficiency of the evidence. The court granted a new trial on all issues for prejudicial jury misconduct. This double appeal followed.

DISCUSSION

I

*Partial Judgment Notwithstanding the Verdict Is Proper.*

 Plaintiffs contend that the trial court lacked the power under the statute to grant a partial judgment notwithstanding the verdict. (Code Civ. Proc., § 629 [unless otherwise indicated, all further references are to this code].) According to plaintiffs, a trial court's authority in ruling on a motion for judgment notwithstanding the verdict is an all-or-nothing proposition. As they see it, the court must grant judgment notwithstanding the verdict on all issues or none. We reject this construction of the statute.

Section 629, the statute governing motions for judgment notwithstanding the verdict, provides in relevant part: "The court, before the expiration of its power to rule on a motion for a new trial, either of its own motion after five days' notice, or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwith-

---

[3] Strictly speaking, there is no such thing as a cause of action for civil conspiracy. The significance of a claim of a civil conspiracy is to hold the participants in the conspiracy liable for the wrongful acts of other participants as joint tortfeasors regardless of whether they actually participated in the tortious act. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 44, pp. 107-108.)

standing the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made."[4]

The statutory grounds for a directed verdict are contained in section 630. Subdivision (b) of that section provides: "If it appears that the evidence presented supports the granting of the motion as to some, but not all, of the issues involved in the action, the court shall grant the motion as to those issues and the action shall proceed on any remaining issues. Despite the granting of such a motion, no final judgment shall be entered prior to the termination of the action, but the final judgment, in addition to any matter determined in the trial, shall reflect the verdict ordered by the court as determined by the motion for directed verdict."

Since a trial court has the authority to grant a motion for judgment notwithstanding the verdict "whenever a motion for a directed verdict for the aggrieved party should have been granted" and a directed verdict may be granted "as to some, but not all, of the issues involved in the action," it follows, as surely as the greater includes the lesser, that a trial court may grant judgment notwithstanding the verdict as to some but not all issues.

---

[4] Section 629 reads in its entirety: "The court, before the expiration of its power to rule on a motion for a new trial, either of its own motion after five days' notice, or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made. [¶] A motion for judgment notwithstanding the verdict shall be made within the period specified by Section 659 of this code in respect of the filing and serving of notice of intention to move for a new trial. The making of a motion for judgment notwithstanding the verdict shall not extend the time within which a party may file and serve notice of intention to move for a new trial. The court shall not rule upon the motion for judgment notwithstanding the verdict until the expiration of the time within which a motion for a new trial must be served and filed, and if a motion for a new trial has been filed with the court by the aggrieved party, the court shall rule upon both motions at the same time. The power of the court to rule on a motion for judgment notwithstanding the verdict shall not extend beyond the last date upon which it has the power to rule on a motion for a new trial. If a motion for judgment notwithstanding the verdict is not determined before such date, the effect shall be a denial of such motion without further order of the court. [¶] If the motion for judgment notwithstanding the verdict be denied and if a new trial be denied, the appellate court shall, when it appears that the motion for judgment notwithstanding the verdict should have been granted, order judgment to be so entered on appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict. [¶] Where a new trial is granted to the party moving for judgment notwithstanding the verdict, and the motion for judgment notwithstanding the verdict is denied, the order denying the motion for judgment notwithstanding the verdict shall nevertheless be reviewable on appeal from said order by the aggrieved party. If the court grants the motion for judgment notwithstanding the verdict or of its own motion directs the entry of judgment notwithstanding the verdict and likewise grants the motion for a new trial, the order granting the new trial shall be effective only if, on appeal, the judgment notwithstanding the verdict is reversed, and the order granting a new trial is not appealed from or, if appealed from, is affirmed."

This conclusion renders a court's authority on a motion for judgment notwithstanding the verdict consistent with judicial authority under every other procedural device for resolving issues. For example, at the pleading stage a party may demur, not just to the complaint or cross-complaint, but also to any causes of action stated in it. (§ 430.50, subd. (a).) Similarly, a party may demur to an answer or to any of the defenses set up in the answer. (§ 430.50, subd. (b).) A party may also move to strike from a pleading any improperly pleaded matters. (§§ 436-437.) During pretrial proceedings, a party may move for and a court may grant summary judgment on all issues or summary adjudication of some of the issues. (§ 437c, subd. (f).) A trial court has the power to bifurcate the trial for separate resolution of special defenses (§§ 597, 597.5), or of any issue or part of an issue (§ 598). During a trial a court has the power to grant a nonsuit as to all or some of the issues involved in the case. (§ 581c, subd. (b).) In like manner, a court may direct the jury to find a special verdict upon all or any of the issues. (§ 625.) A court may grant a directed verdict as to all or some of the issues. (§ 630, subd. (b).) In like fashion, in a court trial the court may grant a motion for judgment as to some but not all the issues involved in the action. (§ 631.8, subd. (b).) After trial the court may grant a new trial on all or part of the issues. (§ 662.) ▆ On appeal from a judgment the appellate court may reverse the judgment on all or some issues. (*Gray* v. *Cotton* (1913) 166 Cal. 130, 139 [134 P. 1145].) And the court may direct that a new and different judgment be entered on some issues or may order that some but not all issues be retried. (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713]; *Noack* v. *Zellerbach* (1936) 14 Cal.App.2d 249, 251-252 [57 P.2d 1390].)

A court's power to partially resolve the issues in a case has not always existed. For example, section 437c once provided for partial summary judgment only in favor of a plaintiff. In 1965 it was amended to permit partial summary judgment for any party on any cause of action or defense. (Stats. 1965, ch. 162, §§ 1-2, pp. 1126-1127.) In 1973 it was amended to permit summary adjudication of any issue in the case. (Stats. 1973, ch. 366, § 1, pp. 807-808.) The same was true of the separate trial of issues. As enacted in 1963, section 598 permitted a court to order separate trial of only the issue of liability. (Stats. 1963, ch. 1205, § 1, pp. 2705-2706.) It was amended in 1977 to permit a court to order separate trial of any issue or part of an issue. (Stats. 1977, ch. 57, § 1, p. 447.) This historical trend toward expansion of separate treatment of issues has continued unabated. For example, prior to 1980 it had been judicially held that trial courts could not grant partial nonsuits. (*Estate of Jamison* (1953) 41 Cal.2d 1, 5-6 [256 P.2d 984]; *Amer. Aero. Corp.* v. *Grand Cen. Aircraft Co.* (1957) 155 Cal.App.2d 69, 85-86 [317 P.2d 694].) It was reasoned that granting partial nonsuits could result in multiple appealable judgments in violation of the one final judgment rule.

(*Estate of Jamison, supra*, 41 Cal.2d at pp. 5-6.) In 1980 section 581c was amended to permit courts to grant partial nonsuits. (Stats. 1980, ch. 187, § 1, pp. 409-410.) The Legislature resolved the multiple-judgment difficulty by providing that despite the granting of the motion for nonsuit a final judgment should not be entered until termination of the action. (*Ibid.*) The same evolution occurred with directed verdicts. Prior to 1986 the power to direct a verdict was recognized in our statutes dealing with judgment notwithstanding the verdict, but was not otherwise statutorily endorsed. In 1986 the Legislature statutorily provided for directed verdicts in section 630, and in doing so specifically provided for partial directed verdicts. (Stats. 1986, ch. 540, § 12, pp. 1936-1937.)

██ It is against this historical backdrop that we examine the provisions of section 629 and plaintiffs' contention that the trial court lacks jurisdiction to grant a partial judgment notwithstanding the verdict. That section provides that the court "shall render judgment" whenever a motion for directed verdict should have been granted had 4 one been made. ██ ██ ██ ██ It has been asserted that the requirement that the court "render judgment" would conflict with the one final judgment rule[5] if the court were permitted to grant partial judgment notwithstanding the verdict. The immediate entry of a judgment disposing of some but not all of the issues could result in multiple appealable judgment in violation of the rule. (*Moore* v. *City & County of San Francisco* (1970) 5 Cal.App.3d 728, 734 [85 Cal.Rptr. 281].)

This concern was expressed at a time when the courts simply did not recognize the power of a trial court to resolve some of the issues in a case without entering an immediate, final and appealable judgment. Thus, in *Estate of Jamison, supra*, 41 Cal.2d at pages 5 and 6, the court noted that a judgment of nonsuit is a final and appealable judgment and found it doubtful whether a partial nonsuit could be granted because such an order would result in multiple appealable judgments. Similarly, in *Jach* v. *Edson* (1967) 255 Cal.App.2d 96 [62 Cal.Rptr. 925], the court stated that section 629 "not only does not confer authority to direct a judgment notwithstanding the verdict as to one issue in the case and grant a new trial as to another issue, but specifically provides the order granting a new trial will be effective

---

[5] Section 904.1 provides in relevant part that an appeal may be taken from a superior court from "a judgment, except (1) an interlocutory judgment, other than as provided in subdivisions (h) and (i), . . . ." As Witkin notes, the intent of this statute was "to codify the *final judgment rule*, or rule of *one final judgment*, a fundamental principle of appellate practice in the United States. The theory is that piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and that a review of intermediate rulings should await the final disposition of the case." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 43, p. 67, italics in original.)

only if the order granting judgment notwithstanding the verdict is reversed." (*Id.* at p. 100.)

Plaintiffs rely on the *Moore* and *Jach* decisions in support of their contention that the trial court lacks jurisdiction to grant a partial judgment notwithstanding the verdict. But as we have already noted, since the time these decisions were rendered, the Legislature has consistently acted to expand the trial court's power to enter partial resolutions of issues. Where the Legislature, in devising a procedure for partial resolution of issues, has failed to coordinate expressly the procedure with the one final judgment rule, then the reviewing courts have harmonized the partial resolution procedure with the one final judgment rule through construction. For example, a potential conflict arose under the procedure for bifurcated trials. (§ 598.) In one case it appeared that a defendant who was found to have been liable in the liability portion of a bifurcated trial had unsuccessfully moved for judgment notwithstanding the verdict. Since an order denying a motion for judgment notwithstanding the verdict is an appealable order (§ 904.1, subd. (d)), the defendant attempted to appeal before the trial of the damage issues. The appellate court dismissed the appeal, concluding that such an interim appeal would defeat the very purposes and procedures approved by the Legislature in enacting a procedure for bifurcated proceedings. (*Horton* v. *Jones* (1972) 26 Cal.App.3d 952, 956-957 [103 Cal.Rptr. 399].) Accordingly, after the first stage of a bifurcated proceeding, the trial court should enter a minute order (and not a judgment) and then proceed with the trial of any remaining issues. (*Id.* at p. 959.) In such a case, the entry of a final appealable judgment must await the termination of the action.

In many situations in which the Legislature has acted to provide for partial resolution of issues or cases it has included the means of satisfying the one final judgment rule within its statutory scheme. For example, in section 581c, a trial court is empowered to grant a nonsuit as to some but not all issues. The one final judgment rule is preserved through the provision that despite granting the motion, "no final judgment shall be entered prior to the termination of the action, but the final judgment in the action shall, in addition to any matter determined in the trial, award judgment as determined by the [nonsuit motion]." (§ 581c, subd. (b).)

Until recently there was no statutory procedure for a directed verdict. Under the judicially developed standards for a directed verdict, a partial directed verdict did not conflict with the one final judgment rule because in directing a verdict the court did not itself resolve the issue; rather, the court compelled the jury to resolve the issues in a certain way through its instructions. (See *Estate of Jamison, supra,* 41 Cal.2d at p. 6.) In enacting statutory provisions for a directed verdict, the Legislature recognized the artifice of

requiring a jury to return a compelled verdict and thus provided that an order granting a directed verdict is effective without the assent of the jury. (§ 630, subd. (e).) This created a potential conflict with the one final judgment rule, a conflict which was resolved in the same manner as it had been with respect to nonsuits. The statute directs that despite granting the directed verdict motion as to some issues, a final judgment should be entered only upon termination of the action. (§ 630, subd. (b).)

The court's power to grant a nonsuit or to direct a verdict is particularly analogous to the power to grant a motion for judgment notwithstanding the verdict, since these powers are merely different aspects of the same judicial function and have long been held to be governed by the same rules. (*Reynolds* v. *Willson* (1958) 51 Cal.2d 94, 99 [331 P.2d 48]; *Jones* v. *Evans* (1970) 4 Cal.App.3d 115, 122 [84 Cal.Rptr. 6]; *Bulow* v. *Dawn Patrol* (1963) 216 Cal.App.2d 721, 730-731 [31 Cal.Rptr. 132].) In fact, it has been said that the power to grant a judgment notwithstanding the verdict is "absolutely the same" as the power to grant a nonsuit or to direct a verdict. (*Hergenrether* v. *East* (1964) 61 Cal.2d 440, 442 [39 Cal.Rptr. 4, 393 P.2d 164]; *Robinson* v. *North American Life & Cas. Co.* (1963) 215 Cal.App.2d 111, 118 [30 Cal.Rptr. 57].) Indeed, that is why the Legislature statutorily incorporated the standards for a directed verdict into the standards for a judgment notwithstanding the verdict. As we have seen, those standards do not limit the court to an all-or-nothing approach.

Section 629, as written, does contain a potential inconsistency which requires construction. It requires the court, when granting a motion for judgment notwithstanding the verdict to "render judgment in favor of the aggrieved party." If the requirement to "render judgment" is construed to mean that a final and immediately appealable judgment must be rendered, one that would not be affected by the granting of a partial judgment notwithstanding the verdict, then the power to grant such a motion would, in some circumstances, conflict with the one final judgment rule. On the other hand, if, in order to avoid potential conflict with the one final judgment rule, we were to construe section 629 so as to preclude partial judgment notwithstanding the verdict, then we would necessarily negate that portion of the statute which requires that judgment notwithstanding the verdict be granted whenever a motion for directed verdict should have been granted had such a motion been made.

When faced with potential inconsistencies in a statute, it is necessary to construe it in a manner which will harmonize it with the statutory scheme of which it is a part and thus fulfill the intention of the Legislature. As the high court has instructed, "[i]n examining statutes that appear to conflict, we are guided by settled rules of statutory construction. The most

fundamental of these rules is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. Statutes that are apparently in conflict should, if reasonably possible, be reconciled, . . ." (*Walters* v. *Weed* (1988) 45 Cal.3d 1, 9 [246 Cal.Rptr. 5, 752 P.2d 443], citation omitted.) In this case we have no doubt how this harmonization and reconciliation must be accomplished. A trial court's power on motion for judgment notwithstanding the verdict has long been said to be "absolutely the same" as its power on motion for a nonsuit or for a directed verdict for a good reason. These procedural devices are actually different aspects of the same judicial function and for them to mesh together appropriately it is necessary that the standards be the same for each procedure. ■ For example, a court may grant a nonsuit as early as the conclusion of the plaintiff's opening statement where it plainly appears the plaintiff's statement of the facts does not entitle him to prevail. However, even if an unartful plaintiff's opening statement is technically deficient, if there should be any possibility that the evidence might support recovery then a court is encouraged to deny the motion for a nonsuit in favor of, and in reliance upon, the power to direct a verdict after hearing the evidence. (See 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 416, pp. 417-418.) And on a motion for a directed verdict, courts are often encouraged, for purposes of judicial economy, to deny the motion in favor of, and once again in reliance upon, the power to grant judgment notwithstanding the verdict after the jury's deliberations. (See Annot., Judgment Notwithstanding the Verdict (1957) 69 A.L.R.2d 449, 468-469.)[6] If the power to grant judgment notwithstanding the verdict is not coextensive with the power to grant a directed verdict, then trial courts will be compelled to dispose of issues on motion for directed verdict out of fear of losing the authority to enter an appropriate disposition at a later time. Such a result serves neither the policy in favor of expeditious and efficient resolution of issues nor the clearly expressed legislative intent that the authority on a motion for judgment notwithstanding the verdict be coextensive with the power to direct a verdict.

■ In order to maintain the legally efficient and legislatively mandated consistency between the power to direct a verdict and the power to enter judgment notwithstanding the verdict, we conclude that we must give effect to section 629's requirement that a court grant judgment notwithstanding

---

[6]The power of a court to delay, in effect, ruling upon a motion for directed verdict in reliance upon the power to grant judgment notwithstanding the verdict is particularly efficacious. In the event an appellate court should disagree with the trial court's view of the legal sufficiency of the evidence, the reversal of the judgment notwithstanding the verdict can result in the reinstatement of the jury verdict. This avoids the necessity of a time consuming and costly retrial and potential second appeal, as would be required where a nonsuit or directed verdict is reversed.

the verdict when a motion for a directed verdict should have been granted had one been made. This includes, under section 630, subdivision (b), "granting of the motion as to some, but not all, of the issues involved in the action, . . ."

As we shall explain, this construction of the statute does not violate the one judgment rule and is consistent with and readily conformable to existing practice with respect to new trial orders. In a jury trial, the clerk is required to enter judgment on the verdict within 24 hours after the rendition of the verdict. (§ 664.) ■ When the court grants a judgment notwithstanding the verdict with respect to all the causes of action, that judgment vacates the earlier judgment entered by the clerk. (*Lippert* v. *AVCO Community Developers, Inc.* (1976) 60 Cal.App.3d 775, 777-778 [131 Cal.Rptr. 730].) The judgment is similarly vacated when the court grants a new trial as to all of the causes of action. (*Lapique* v. *Walsh* (1923) 191 Cal. 22, 24 [214 P. 876]; *Rigall* v. *Lewis* (1934) 1 Cal.App.2d 737, 739 [37 P.2d 97]; see generally, 8 Witkin, Cal. Procedure (3d ed. 1985) Attack on Judgment in Trial Court, § 129, pp. 532-533.) This same rule applies when the court grants a partial new trial and, by analogy, should apply when the court grants a partial judgment notwithstanding the verdict. There is no question that a trial court has the power to grant a subsequent motion for a new trial as to some but not all of the issues involved. (§ 657.) It has been argued that where a partial new trial is granted, the undisturbed issues remain as the subject of the judgment entered by the clerk and hence are subject to immediate appeal. However, in these circumstances the rule is settled that the portions of the judgment which are not subject to the new trial order are nevertheless not appealable. The courts have reasoned that the new trial order has the effect of vacating the entire judgment and holding in abeyance the portions which are not subject to a new trial until one final judgment can be entered. (*Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 345 [87 Cal.Rptr. 226]; *Love* v. *Wolf* (1967) 249 Cal.App.2d 822, 840 [58 Cal.Rptr. 42]; *King* v. *Goldberg* (1958) 159 Cal.App.2d 543, 545-547 [323 P.2d 1035]; *Universal Film Mgf. Co.* v. *Kerrigan* (1920) 47 Cal.App. 255, 256-257 [190 P. 475].) As the *Wolf* court explained it in the context of a new trial on the single issue of damages, the "superior court judgment was set aside in its entirety when the court granted a new trial as to damages . . . ." (249 Cal.App.2d at p. 840, citations omitted.) "As there can be only a single judgment in an action, if the order granting the limited new trial of damages is to stand, there will be no final judgment until the trial of that issue ends and the determination of the appeal, if any, from the then judgment. [¶] If the order does not stand, the judgment set aside by the order for new trial would be restored and then become final unless reversed." (*Ibid.*) Were the rule otherwise, two appealable judgments would be entered in violation of the one judgment rule.

A similar result obtains here. A motion for judgment notwithstanding the verdict essentially asks the trial court to vacate the judgment entered on the verdict and to enter a new judgment despite the verdict. An order granting partial judgment notwithstanding the verdict has the effect of modifying the judgment on the verdict. If the trial court otherwise upholds the verdict, then the judgment, as modified by the partial judgment notwithstanding the verdict, is immediately appealable. Where, however, the trial court grants a new trial as to issues which are not affected by the judgment notwithstanding the verdict, then the new trial order must be held to have the effect of vacating and holding in abeyance the entire judgment, as modified by the order granting judgment notwithstanding the verdict, until one final judgment can be entered.

 There is one exception to the rule that a partial new trial order vacates and holds in abeyance the entire judgment. The exception occurs when the judgment retains sufficient vitality to support appellate review if the matter is otherwise properly brought before the appellate court. A new trial order, including an order for a partial new trial, is an appealable order. (§ 904.1, subd. (d).) Where an aggrieved party appeals from a new trial order, then the entire judgment is subject to appellate review at that time. (*Spencer* v. *Nelson* (1947) 30 Cal.2d 162, 164 [180 P.2d 886].) "One effect of an order granting a new trial is, of course, to vacate the judgment; however, when an appeal is taken from such an order the vacating effect is suspended, and the judgment remains effective for the purpose of an appeal from the judgment." (*Id.* at p. 164.) That is also the situation here. The trial court granted partial judgment notwithstanding the verdict and granted a new trial as an alternative to the partial judgment notwithstanding the verdict and as to all other issues. Since plaintiffs have properly appealed from the new trial order, the judgment, including the portion affected by the judgment notwithstanding the verdict, is subject to review in this appeal.

It has also been suggested that the last paragraph of section 629 demonstrates the impropriety of a partial judgment notwithstanding the verdict. That paragraph provides in relevant part: "If the court grants the motion for judgment notwithstanding the verdict or of its own motion directs the entry of judgment notwithstanding the verdict and likewise grants the motion for a new trial, the order granting the new trial shall be effective only if, on appeal, the judgment notwithstanding the verdict is reversed, and the order granting a new trial is not appealed from or, if appealed from, is affirmed." If this provision were applied rigidly and literally then where, as here, a court enters partial judgment notwithstanding the verdict and grants a new trial on the remaining issues, the order granting a new trial on the remaining issues cannot be given effect unless the partial judgment notwith-

standing the verdict is reversed, a preposterous and anomalous result. (See *Jach* v. *Edson, supra*, 255 Cal.App.2d at p. 100.)

We do not find a bar to partial judgment notwithstanding the verdict in the last paragraph of section 629. That paragraph does not specifically address partial judgments notwithstanding the verdict and should not be taken by implication to negate the express command such a judgment be entered whenever a directed verdict would have been appropriate. This provision was in fact part of the Legislature's effort to coordinate motions for judgment notwithstanding the verdict with new trial motions. Originally, a party was permitted to reserve the right to apply for a new trial in the event a motion for judgment notwithstanding the verdict was denied. (Former § 629; Stats. 1923, ch. 366, § 1, pp. 749-750.) The Legislature later acted to provide that the motions could be, and indeed were required to be, made contemporaneously. (Stats. 1951, ch. 801, § 1, pp. 2288-2289.) This created the anomalous situation in which the granting of a motion for a new trial could have the effect of negating an order granting judgment notwithstanding the verdict. Accordingly, the Legislature statutorily provided that where both judgment notwithstanding the verdict and a new trial are granted, then the new trial order is contingent upon reversal of the judgment notwithstanding the verdict.

In enacting this provision, the Legislature was not concerned with the question whether partial judgment notwithstanding the verdict could be granted and the paragraph of section 629 does not, therefore, purport to address that question. At the time of the decision in *Jach* v. *Edson, supra*, 255 Cal.App.2d 96, most procedural devices for the resolution of cases did not permit partial resolution. Thus, the decision in *Jach*, and its reference to the last paragraph of section 629, were consistent with general law. But times have changed and in the words of H. L. Mencken, "[t]ime is a great legalizer . . . ." (Mencken, A Book of Prefaces (1917) p. 282.) With respect to virtually every other issue-resolution device, the Legislature has approved partial resolution of issues, and it has done so with respect to judgments notwithstanding the verdict by incorporation of the standards for directed verdicts. These later and more specific pronouncements must be given effect over provisions which are, at best, ambiguous on the subject. This does no great violence to the language of the last paragraph of section 629. The issues in a case have long been considered severable for purposes of a new trial motion. (8 Witkin, Cal. Procedure (3d ed. 1985) Attack on Judgment in Trial Court, § 109, pp. 512-513.) By the same token, issues may properly be considered severable for purposes of contingency under section 629. Thus, where a trial court grants partial judgment notwithstanding the verdict and a new trial, the new trial order is contingent upon

reversal of the judgment notwithstanding the verdict to the extent the orders overlap, and is otherwise effective.[7]

In view of this discussion, we reject plaintiffs' contention that a court's power on motion for judgment notwithstanding the verdict is an all-or-nothing proposition. For the reasons stated, we conclude that a trial court may grant a motion for judgment notwithstanding the verdict on some but not all issues or causes of action in a case. ■■ ■■■ ■ In fact, this has been a commonly utilized procedure in this state. (*California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 13 [221 Cal.Rptr. 171]; *Mason* v. *Mercury Cas. Co.* (1976) 64 Cal.App.3d 471, 473 [134 Cal.Rptr. 545]; *Louisville Title Ins. Co.* v. *Surety Title & Guar. Co.* (1976) 60 Cal.App.3d 781, 787-788 [132 Cal.Rptr. 63]; *Young* v. *Berry Equipment Rentals, Inc.* (1976) 55 Cal.App.3d 35, 37 [127 Cal.Rptr. 200]; *Gordon* v. *Strawther Enterprises, Inc.* (1969) 273 Cal.App.2d 504, 515-516 [78 Cal.Rptr. 417].)[8]

### II-V*

. . . . . . . . . . . . . . . . . . . .

### CONCLUSION

We have concluded that the trial court did not err in determining to grant judgment notwithstanding the verdict on plaintiffs' claims for punitive dam-

[7]Section 629 has been harmonized with other statutes in other respects as well. For instance, in *Sturgeon* v. *Leavitt* (1979) 94 Cal.App.3d 957 [156 Cal.Rptr. 687], the court harmonized the statutory time provisions for granting a judgment notwithstanding the verdict. Section 629 provides that a "motion for judgment notwithstanding the verdict shall be made within the period specified by Section 659 of this code in respect of the filing and serving of notice of intention to move for a new trial." Section 659 in turn provides that the notice of intention to move for a new trial must be filed and served before entry of judgment or within 15 days of the date of mailing notice of entry of judgment by the clerk or service by a party of written notice of entry of judgment. The *Sturgeon* court held that "the Legislature intended the cross reference to section 659 appearing in section 629 to apply only when a *party* and not the *court* moves for a judgment notwithstanding the verdict . . . . Thus, we would be acting improvidently to interpret that language similarly to circumscribe motions for j.n.o.v. made by a court." (*Id.* at p. 964, italics in original.)

[8]In response to defendants' reliance upon *California Shoppers* and *Mason*, plaintiffs note that in those cases the procedure was utilized but that the validity of its use was not challenged and thus the issue was not decided by the appellate courts. They are correct, but we cite these cases to demonstrate the frequency of use and utility of the procedure and not as dispositive authority. This question does, however, point to an alternative resolution of the issue. Although plaintiffs raise this issue on appeal they have not demostrated that they objected to the procedure in the trial court and may thus be held to have waived the objection. (See *Young* v. *Berry Equipment Rentals, Inc., supra*, 55 Cal.App.3d at p. 38, fn. 1.)

*See footnote, *ante*, page 310.

ages, fraudulent concealment, and the intentional infliction of emotional distress. We have further concluded that the claims for constructive fraud and breach of the implied covenant of good faith and fair dealing were not supported by sufficient evidence and should have been included in the order granting judgment notwithstanding the verdict. We have also concluded that the court did not abuse its discretion in denying plaintiffs' dilatory motion to amend the complaint to set forth claims based upon alleged claims settlement practices, and that the decision to grant a new trial on the ground of jury misconduct is well supported by the record.

## DISPOSITION

The court's order granting the motion for judgment notwithstanding the verdict is modified to include claims for constructive fraud and breach of the implied covenant of good faith and fair dealing. As modified and in all other respects that order, and the order granting a new trial, are affirmed. Defendants shall recover their costs on appeal.

Sims, J., and Marler, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied February 14, 1991.