Filed 11/13/14  Wang v. TDS Group CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| YA HUI WANG et al.,<br><br>　　Plaintiffs and Appellants,<br><br>v.<br><br>THE TDS GROUP, INC.,<br><br>　　Defendant and Appellant. | H038786<br>(Santa Clara County<br>Super. Ct. No. 1-09-CV152551) |

## I.  INTRODUCTION

Appellant Ya Hui Wang (also known as Emily Wang) marketed and sold employer-sponsored retirement plans to school district employees through her affiliation with appellant The TDS Group, Inc. (TDS), a retirement plan administrator.  Wang and TDS had resolved Wang's previous wrongful termination action with two settlement agreements that were intended to create their future working relationship.  In the present action, Wang alleges that TDS failed to comply with the terms of the settlement agreements.  Her complaint includes causes of action for breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with economic relationship, and intentional interference with prospective business relationship.

The matter proceeded to a jury trial that concluded in a special verdict awarding Wang more than $4 million on all causes of action.  In posttrial motions, the trial court

granted TDS's motion for new trial on the breach of contract cause of action and also granted TDS's motion for judgment notwithstanding the verdict on the tort causes of action for intentional interference with economic relationship and intentional interference with prospective business relationship.

Wang has appealed from both posttrial orders. For reasons that we will explain, we will affirm the order granting TDS's motion for new trial on breach of contract and dismiss Wang's appeal of the order granting the judgment notwithstanding the verdict on the tort causes of action for intentional interference with economic relationship and intentional interference with prospective business relationship because the order is nonappealable.

TDS has cross-appealed. For reasons that we will explain, we will affirm the August 14, 2012 order denying TDS's motion for judgment notwithstanding the verdict on the breach of contract cause of action. We also determine that the August 16, 2012 order denying TDS's motion for new trial on the tort causes of action for intentional interference with prospective economic relations and intentional interference with contractual relations is moot.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The Complaint*

In 2009 Wang brought this action against defendant TDS, a third party pension plan administrator with whom she was affiliated. According to the allegations in the complaint, Wang's claims in the present action arise from her prior dispute with TDS. Wang had filed a wrongful termination action against TDS in 2004 that included claims for race and sex discrimination, breach of contract, fraud, and other torts. The 2004 action was resolved by the parties entering into two settlement agreements, dated October 26, 2007, and January 31, 2008.

Wang alleged that the 2007 and 2008 settlement agreements provided, among other things, that she had the exclusive right to market and sell employer-sponsored

2

supplemental retirement plans for TDS to school employees of specified school districts; a right of first refusal to market and sell the retirement plans in other specified school districts; permission to transfer her book of business to her husband in the event of her death and disability; and the right to determine if the transfer of her book of business to another broker-dealer[1] was in her best interest.  The settlement agreements also provided that Wang would pay TDS a 7 percent override[2] for three years, followed by a 10 percent override thereafter.

According to Wang, TDS "wrongly cancelled" the 2007 and 2008 settlement agreements on June 26, 2009, by sending her a termination notice stating that her affiliation with TDS and all of her agreements with TDS were terminated immediately. The termination notice was preceded by a conference call with Robert Lotter, in which Wang was informed that TDS had been sold to Lotter and he was the new CEO.  Lotter stated in the conference call that "everyone who wished to stay with TDS must change the existing broker to a new broker-dealer called 'Questar.' "

Wang further alleged that in July 2009 the president of TDS, Loy Doug Holt, informed Wang that Lotter was willing to honor the 2007 and 2008 settlement agreements if Wang moved to Questar, the new broker-dealer.  In August 2009 Lotter offered to honor the settlement agreements if the override that Wang paid to TDS was increased from 7 percent to 20 percent and Wang waived her right of first refusal to market and sell in Contra Costa County.  Wang did not accept Lotter's offer and in

---

[1] A "broker-dealer" is "a person or a financial company that acts both as a broker, making investments for customers, and as a dealer making investments for themselves[.]" (Cambridge Business English Dictionary (2014) <http://dictionary.cambridge.org/us/dictionary/business-english/broker-dealer?q=broker+dealer> [as of Nov. 13, 2014].)

[2] An "override" is defined as "a commission paid to managerial personnel on sales made by subordinates."  (Merriam-Webster's Online Dict. (2014) <http://www.merriam-webster.com/dictionary/override> [as of Nov. 13, 2014].)

September 2009 TDS sent a letter to Wang confirming that her affiliation with TDS was terminated effective June 26, 2009.

Based on these and other allegations, Wang asserted causes of action for breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with economic relationship, and intentional interference with prospective business relationship.[3]

**B.** *Trial Evidence*

A jury trial was held in 2012. The following is a brief summary of the relevant witness testimony and other evidence presented at trial.

**1. TDS**

School districts are the customers of TDS, which is a third party administrator of supplemental retirement plans for public school employees. Sales advisors, also known as representatives of TDS, sell the supplemental retirement plans. TDS licenses the representatives to use the TDS name and logo and receives a commission from the securities broker-dealer or the insurance company whose product is sold.

All of TDS's representatives work with the same broker-dealer so that TDS can receive the commissions for mutual fund sales. TDS does not receive direct payment of commissions. The broker-dealer pays commissions directly to an individual known as the OSJ (office of supervisory jurisdiction). Loy Douglas Holt and Alonzo Wickers were OSJs for TDS. Their duties as an OSJ included supervising the TDS representatives so that their sales of financial services are done correctly.

The broker-dealer has to approve any outside business activities by TDS that do not involve securities sales, such as selling fixed insurance products or working as a plan administrator.

---

[3] The record reflects that the cause of action for breach of the covenant of good faith and fair dealing was not presented to the jury.

4

### 2. Wang's Relationship with TDS

When Wang began working with TDS as a plan administrator representative, the president of TDS was Holt. Her OSJ was Wickers, who supervised all of TDS's representatives and approved all of the sales transactions for the retirement plans.

Wang carried a TDS business card and was assigned to specific public schools where she would host a presentation to school employees regarding the types of retirement plans that TDS was offering. Wang also had a direct contract with insurance companies for selling fixed annuities. About 75 percent of her commissions came "on the fixed side" and were paid directly to her by the insurance companies. Wang paid 7 percent of her commissions on the fixed side to Holt in accordance with her settlement agreements with TDS.

If Wang was selling a financial product for TDS that was linked to the stock market, she had to work under a securities broker-dealer. The commission structure was different for a financial product that was linked to the stock market. The commission on the sale of those products was paid first to the broker-dealer, who then paid 7 percent of the commission to Wickers and 93 percent of the commission to Wang. If the sale was made by one of Wang's agents, the agent received 45 percent of the commission directly from the broker-dealer.

### 3. The Settlement Agreements

Wang had been successful as a sales agent and had received various awards. She became involved in a dispute with TDS that was resolved in a settlement agreement dated October 26, 2007, and a second settlement agreement dated January 31, 2008. According to Holt, the purpose of the 2008 settlement agreement was to create a future working relationship between Wang and TDS, provided that she executed TDS's trademark license agreement and the registered representatives selling agreement that were attached as exhibits to the 2008 settlement agreement. Wang understood that she would start a working relationship with TDS when she signed the trademark license agreement.

However, Wang never received a copy of the trademark license agreement, was never asked to sign it, and began a working relationship with TDS without ever signing it.

Wang believed that the 2008 settlement agreement also included terms that obligated her to pay TDS a 7 percent override on all business generated from school districts; permitted her to transfer her book of business to her husband in the event of her disability or death; allowed her to sell her book of business subject to TDS's approval, which could not be unreasonably withheld; and provided that Wang agreed to participate in a change of broker-dealer if it was determined to be beneficial to all parties.

According to Wang, the 2008 settlement agreement also gave her the exclusive right to market and sell for TDS in specific school districts. It was never suggested to Wang that there were provisions in the settlement agreements that would allow TDS to terminate her on 30 days' notice. She believed that her relationship with TDS could be terminated only by mutual agreement.

Wang's attorney, Richard Abdahla, recalled that when he negotiated the 2008 settlement agreement there were no discussions with TDS regarding whether the trademark licensing agreement would control the termination of the parties' rights under the settlement agreement. Abdahla did not understand during the parties' negotiations that the termination of Wickers as OSJ would terminate the 2008 settlement agreement. He also recalled that TDS never asked Wang to execute the trademark license agreement that was attached to the 2008 settlement agreement.

Wickers, the former CEO and founder of TDS, was also involved in the settlement of Wang's claims. He understood that the 2008 settlement agreement was a global agreement. The 2007 settlement agreement was intended to allow TDS to move forward with its business relationship with Wang. The trademark license agreement attached to the settlement agreement provided that Wickers, as Wang's OSJ, would manage her representatives and monitor her sales products. Wickers also understood that the

6

trademark license agreement provided that the settlement agreement would remain in effect as long as Wickers was Wang's OSJ.

Holt executed the 2007 settlement agreement and understood that the 2008 settlement agreement was a global agreement that incorporated both the 2007 settlement agreement and TDS's trademark license agreement. He also understood that the 2008 settlement agreement would remain in effect as long as Wang had a relationship with a TDS OSJ, because if she did not have a relationship with a TDS OSJ then neither he nor Wickers could receive commissions on her sales. Holt further understood that the agreements provided that TDS could terminate Wang's rights under the settlement agreement with 30 days' notice.

### 4. Termination of Wang's Relationship with TDS

At the end of 2008, Holt told Wang about a new broker-dealer named Questar that would be able to help TDS grow. Holt wanted a new broker-dealer because the existing broker-dealer for TDS had been sold to another broker-dealer who would not allow TDS to operate as a plan administration company. He knew that Wang had concerns about Questar because Questar wanted the insurance companies' commissions to go through Questar and would not allow Wang to be paid directly by the insurance companies. Holt believed that it was cause for termination if Wang did not move to Questar as her broker-dealer.

Lotter bought TDS in 2009. He knew that Wang had a contractual relationship with TDS that was different than the other 80 agents affiliated with TDS because it was based on a settlement agreement. However, Lotter believed that Wang's contractual relationship with TDS was similar to that of other agents because it concerned territories, commission agreements, and trademark agreements.

In May 2009 Wickers told Wang that he was no longer the OSJ for TDS. In June 2009 Wang participated in a conference call with Lotter in which he stated that he was the new owner of TDS and that everyone who wanted to stay with TDS would have

7

to change their broker-dealer to Questar within a week. Wang had concerns that under Questar her commissions would be reduced and she would be appointed as a non-commissioned agent. Due to her concerns, she did not change her broker-dealer immediately, as Lotter had requested.

About a week after the conference call with Lotter, Wang's TDS e-mail was cut off. Wang then received a letter terminating her relationship with TDS and informing her she was no longer authorized to contact clients of TDS or to represent to them that she was affiliated with TDS in any capacity. Wang later had a meeting with Lotter in which he told her he was not going to honor the 2008 settlement agreement because it was not beneficial for TDS. During that time Wang could not service her clients and her agents could not make any money. She has not been able to generate any new clients since her termination from TDS in 2009.

According to Lotter, Wang did not honor her agreement with TDS when she refused to move to the new broker-dealer, Questar, because TDS could not get paid unless she did. Lotter asserted that TDS never told anyone that Wang had done anything wrong, although Lotter acknowledged sending a letter to school districts about wrongdoing by TDS representatives that became known as the " 'rogue agents' " letter. The letter did not mention Wang by name or identify her as one of the "rogue agents." Lotter knew that Wang had a great reputation as a salesperson and a huge territory and he wanted her to maintain her relationship with TDS under Questar.

### 5. Termination of Other Relationships with TDS

Wickers retired after TDS replaced him as an OSJ in March 2009. He did not believe that his removal as OSJ would have any effect on Wang's contractual relationship with TDS. Due to serious financial problems, Wickers sold TDS in June 2009. He understood that no TDS representatives moved to Questar as their broker-dealer after the sale of TDS to Lotter due their concerns about the potential loss of their commissions.

8

Rene Rocamora owned a small business that provided counseling and financial services to school teachers regarding their retirement investments. He entered into a franchise agreement with TDS in 2002. During the June 2009 conference call with Lotter in which Lotter announced that he had acquired TDS, Lotter mentioned that TDS agents who wanted to remain with TDS needed to move to a new broker-dealer, Questar. Rocamora later had a meeting with Lotter in which Lotter told him that he wanted to change the franchise agreement and have Rocamora pay more fees to TDS.

Rocamora refused to move to Questar because it would have been a major undertaking to move his thousands of clients and he had not received information about the new commission structure and fees. On June 26, 2009, Rocamora's office received a letter from TDS that unilaterally terminated the franchise agreement.

### 6. Damages

Wang's husband, Chris Wong, managed the office and bookkeeping for Wang and was involved in her settlement negotiations with TDS. According to Wong, during fiscal year 2009 Wang received gross commissions of $487,078 from insurance companies and $153,375 from securities broker-dealers. Her 2009 income was down due to her termination from TDS in June 2009.

Wang's economics expert, George McLaughlin, was retained to evaluate her lost income. He calculated that the total net loss to Wang as a result of her termination from TDS was $8,100,577.

### C. *Special Verdict and Judgment*

The jury rendered its special verdict on March 12, 2012. The special verdict form asked the jurors to make findings on the causes of action for breach of contract, intentional interference with prospective economic relations, and intentional interference with contractual relations. After making the requested findings, the jury awarded Wang damages in the amount of $4,218,033 on all causes of action.

9

A judgment in the amount of $4,667,121.86 (which included attorney's fees of $410,802.50 and costs of $38,286.36) was entered on June 18, 2012.

## D. *Posttrial Motions*

TDS filed a posttrial motion for new trial arguing that it was entitled to a new trial because (1) the jury had returned a verdict that defeated an essential element of the breach of contract claim; (2) there was insufficient evidence to support the causes of action for intentional interference with prospective economic relations and intentional interference with contractual relations; (3) the damages award was excessive; and (4) the trial court's multiple erroneous orders during the trial had resulted in a miscarriage of justice.

TDS also filed a posttrial motion for judgment notwithstanding the verdict. Regarding the causes of action for intentional interference with prospective economic relations and intentional interference with contractual relations, TDS reiterated its argument that there was insufficient evidence for a finding of liability on those tort claims. As to the breach of contract cause of action, TDS argued that the claim failed as a matter of law because there was no evidence of a contract; the trial court should have interpreted the settlement agreement to include a 30-day at will termination clause and a no-consequential damages clause, and to lack the material term of the duration of the contract; and the evidence in support of TDS's affirmative defense of frustration of purpose was uncontradicted.

## E. *Trial Court Orders on Posttrial Motions*

The trial court's August 14, 2012 order granted TDS's motion for judgment notwithstanding the verdict in part. The motion was granted as to the tort causes of action for intentional interference with prospective economic relations and intentional interference with contractual relations and denied as to the cause of action for breach of contract.

10

The trial court's August 16, 2012 order granted TDS's motion for new trial in part. The order stated the grounds for the order as follows: "The court, having reviewed the written submissions of the parties and considered the extensive arguments of counsel, granted Defendant's motion for a new trial as to the breach of contract cause of action. The court concluded that the grounds for granting the motion for a new trial were the following: (1) abuse of discretion by the court ([Code Civ. Proc. § 657, subd. (1)]);[4] (2) excessive damages ([§ 657, subd. (5)]); and [(3)] error in law occurring at the trial and objected to by the moving party ([§ 657, subd. (7)])." The August 16, 2012 order did not include a statement of reasons.

Wang filed a timely notice of appeal from the August 14, 2012 order and the August 16, 2012 order. TDS filed a notice of cross-appeal from both orders.

### III. WANG'S APPEAL

On appeal, Wang contends that the August 16, 2012 order granting TDS's motion for new trial on the breach of contract cause of action should be reversed because a new trial is not warranted. Wang also contends that the August 14, 2012 order granting judgment notwithstanding the verdict on the causes of action for for intentional interference with prospective economic relations and intentional interference with contractual relations was improper and should be reversed.

We will begin our evaluation with Wang's challenge to the order granting TDS's motion for a new trial on the breach of contract cause of action since, for reasons that we will explain, we find that issue to be dispositive.

#### A. *Motion for New Trial—Statutory Framework*

"The authority of a trial court in this state to grant a new trial is established and circumscribed by statute. [Citation.] Section 657 sets out seven grounds for such a

---

**4** All statutory references hereafter are to the Code of Civil Procedure unless otherwise indicated.

11

motion: (1) 'Irregularity in the proceedings'; (2) 'Misconduct of the jury'; (3) 'Accident or surprise'; (4) 'Newly discovered evidence'; (5) 'Excessive or inadequate damages'; (6) 'Insufficiency of the evidence [. . . or the verdict . . . is against the law]'; and (7) 'Error in law.' " (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633 (*Oakland Raiders*).)

When a motion for new trial is granted on all or part of the issues raised in the motion, section 657 provides that "the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial . . . ." (§ 657; *Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 899.) Thus, "[s]ection 657 clearly distinguishes between grounds and reasons." (*Id.* at p. 902.)

An order granting a motion for new trial is appealable. (§ 904.1, subd. (a)(4); see *Cobb v. University of So. California* (1996) 45 Cal.App.4th 1140, 1144.) Section 657 provides that "[o]n appeal from an order granting a new trial the order shall be affirmed if it should have been granted upon any ground stated in the motion, whether or not specified in the order or specification of reasons, except that (a) the order shall not be affirmed upon the ground of the insufficiency of the evidence to justify the verdict or other decision, or upon the ground of excessive or inadequate damages, unless such ground is stated in the order granting the motion and (b) on appeal from an order granting a new trial upon the ground of the insufficiency of the evidence to justify the verdict or other decision, or upon the ground of excessive or inadequate damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons."

Thus, where, as here, the order granting a motion for the new trial lacks a statement of reasons, "[t]he order may still be sustained if a new trial should have been granted upon any ground set out in section 657 except the grounds of insufficiency of the evidence or inadequate or excessive damages." (*Oakland Raiders*, *supra*, 41 Cal.4th at

12

p. 636; see also *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 63 [where no reasons were specified, the order granting a new trial cannot be sustained upon the ground of excessive damages].)

## B. *Standard of Review*

Where the trial court's order granting a motion for new trial includes both the grounds and a statement of reasons for granting the motion, the standard of review is abuse of discretion. (*Oakland Raiders*, *supra*, 41 Cal.4th at p. 636.)

The standard of review is different where the order granting a motion for new trial lacks a statement of reasons. "[T]he absence of a statement of reasons calls for independent review of the trial court's order granting a motion for a new trial." (*Oakland Raiders*, *supra*, 41 Cal.4th at p. 640.) "The reviewing court should not . . . defer to the trial court's resolution of conflicts in the evidence, or draw all inferences favorably to the trial court's decision, because in the absence of a statement of reasons, the record does not show whether the trial court resolved those conflicts or drew those inferences." (*Ibid.*)

## C. *Analysis*

### 1. The Parties' Contentions

Wang contends that the only grounds for a new trial motion that may be considered on appeal are the statutory grounds, other than insufficiency of the evidence and excessive damages, that were raised by TDS in its motion, including (1) irregularity in the proceedings that prevented a fair trial (§ 657, subd. (1)); (2) error in law occurring at trial and objected to by the moving party (§ 657, subd. (7)); and (3) a verdict that is against the law (§ 657, subd. (6)).

TDS concedes that since the trial court's August 16, 2014 order granting a new trial did not include a statement of reasons, the order cannot be affirmed on the grounds of insufficiency of the evidence or excessive damages.

13

The parties both begin their appellate arguments with acknowledgment of a defect in the special verdict on breach of contract. We understand their arguments to raise the issue of whether the order granting the motion for new trial should be affirmed on the ground that the special verdict on breach of contract is against the law due to the jury's inconsistent answers to the special verdict questions. Specifically, the jury answered question 3 in TDS's favor, which would appear to defeat the breach of contract claim. (§ 657, subd. (6).) Question 3 states: "Did all the conditions that were required for The TDS Group, Inc.'s performance occur or were they excused?" The jury's answer of "No" to question 3 appears to be inconsistent with the jury's answers in Wang's favor to the other special verdict questions on the breach of contract claim.

We therefore turn to an overview of the section 657, subdivision (6) ground for a new trial of verdict against the law due to inconsistent special verdict answers.

## 2. Verdict Against the Law

Pursuant to section 657, subdivision (6),[5] inconsistent verdicts are against the law and are grounds for a new trial. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682 (*City of San Diego*).) "[A] special verdict's correctness is analyzed as a matter of law and [is] therefore subject to de novo review. [Citation.]" (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 (*Zagami*).)

" 'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence. The rule finds parallel expression in the law relating to court findings: "Where the

---

[5] Section 657, subdivision (6) states: "The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: [¶] . . . [¶] 6. Insufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law."

14

findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error." ' [Citations.] . . . Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law. [Citation.]" (*City of San Diego*, *supra*, 126 Cal.App.4th at p. 682.)

Accordingly, "there is no presumption in favor of upholding a special verdict when the inconsistency is between two questions in a special verdict. [Citation.]" (*Zagami*, *supra*, 160 Cal.App.4th at p.1092.) " 'This rule stems from the nature of a special verdict and its " 'recognized pitfalls,' " namely, that it requires the jury to resolve all of the controverted issues in the case, unlike a general verdict which merely implies findings on all issues in one party's favor. [Citations.]' [Citation.]" (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242.)

"With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the verdict. [Citations.]" (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358; see also *Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 302-303 (*Mendoza*) [same].) Therefore, "[t]he appellate court is not permitted to choose between inconsistent answers. [Citations.]" (*City of San Diego*, *supra*, 126 Cal.App.4th at p. 682.)

For example, the verdict was determined to be against the law and a wrongful termination action was remanded for a new trial where "[t]he jury's finding that there was no breach of contract is irreconcilable with its finding that [the defendant] did breach the implied covenant of good faith . . . ." (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344.)

In *Zagami*, the jury awarded damages of $15,500 on the plaintiff's claim that the defendant had breached a contract for rental and delivery of a skiploader tractor, although the jury had valued the skiploader at $30,000. (*Zagami*, *supra*, 160 Cal.App.4th at pp. 1086-1087.) The appellate court determined that the two damages awards were

15

"internally inconsistent" and therefore against the law, and remanded the matter for a new trial on the issue of damages. (*Id*. at p. 1094.)

Similarly, in *City of San Diego*, the jury made inconsistent findings with regard to the fair market value of the real property at issue in an eminent domain action. (*City of San Diego*, *supra*, 126 Cal.App.4th at p. 682.) In affirming the trial court's order granting a new trial, the appellate court noted that "[w]hen parties submit a special verdict to the jury, they face the danger of having the jury reach inconsistent findings of ultimate fact that may warrant a new trial." (*Id*. at p 686.)

In the present case, the issue is whether the jury's answers to the special verdict questions on breach of contract were inconsistent, such that the verdict is against the law within the meaning of section 657, subdivision (6) and a new trial was properly granted. We therefore turn to an examination of the special verdict on breach of contract.

### 3. The Special Verdict on Breach of Contract

The special verdict on breach of contract is quoted below with the jury's answers indicated.

"1. Did Ya Hui (Emily) Wang, Chun Yu, Inc.[6] and The TDS Group, Inc., enter into a contract?

"ANSWER: [Yes]

"If your answer to question 1 is yes, then answer question 2. If you answered no, then move on to question 7.

"2. Did Ya Hui (Emily) Wang and Chun Yu, Inc. do all, or substantially all, of the significant things that the contract required them to do?

"ANSWER: [Yes]

"OR

---

[6] The record reflects that appellant Chen Yu, Inc., a company associated with Wang, was added as a plaintiff before trial (hereafter, collectively Wang).

16

"Was Ya Hui (Emily) Wang and Chun Yu, Inc. excused from having to do all, or substantially all, of the significant things that the contract required them to do?

"ANSWER:  [*left blank*]

"If your answer to either option for question 2 is yes, then answer question 3.  If you answered no to both options, then move on to question 7.

"3.  Did all the conditions that were required for The TDS Group, Inc.'s performance occur or were they excused?

"ANSWER:  [No]

"If your answer to question 3 is no, then answer question 4.  If you answered yes, then move on to question 7.

"4.  Did The TDS Group, Inc. fail to do something that the contract required it to do?

"ANSWER:  [Yes]

"OR

"Did The TDS Group, Inc. do something that the contract prohibited it from doing?

"ANSWER:  [*left blank*]

"If your answer to either option for question 4 is yes, then answer question 5.  If you answered no to both options, then move on to question 7.

"5.  Were Ya Hui (Emily) Wang and Chun Yu, Inc. harmed by that failure?

"ANSWER:  [Yes]

"If your answer to question 5 is yes, then answer question 6.  If you answered no, then move on to question 7.

"6.  What are Ya Hui (Emily) Wang and Chen Yu, Inc.'s damages?  [ANSWER:] $4,218,033

"After answering question 6, move on to question 7."  (Underscoring added.)

In its motion for new trial, TDS argued that the jury's answer of "No" to question 3 resulted in the cause of action for breach of contract failing as a matter of law. TDS asserted that "[i]t is clear from the CACI [Judicial Council of California Civil Jury Instructions] 303 instruction and the CACI VF-300 [verdict form] that a 'Yes' answer is required in order for the jury to continue answering questions on the breach of contract claim."

TDS further asserted that "[t]his jury, after properly being instructed that a necessary element to the Plaintiffs' breach of contract cause of action was the occurrence of all conditions requiring TDS to perform, unanimously responded 'No.' " For that reason, TDS contended that the verdict in Wang's favor on the breach of contract cause of action was against the law. Alternatively, TDS argued that the verdict was against the law because it "is irreconcilably uncertain and ambiguous."

According to Wang, question 3 in the special verdict on breach of contract was originally based on CACI VF-300. Question 3 in the CACI VF-300 verdict form for breach of contract reads as follows: "Did all the conditions that were required for [*name of defendant*]'s performance occur or were they excused? [¶] Yes No [¶] If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form."[7]

On appeal, Wang asserts that "Plaintiffs' counsel, counsel for Defendant, and the court, all read the question [3 in CACI VF-300] as meaning that if the jury answered yes, they were saying that TDS did everything it was supposed to do, or on the other hand it may have been excused. [Citation.] In accord with that reading of Question 3, the court modified the form before it was submitted to the jury. The modified form required an answer of 'no' to Question 3 if the jury intended to proceed further with the breach of

---

[7] The directions for use of CACI VF-300 state: "Include question 3 if conditions for performance are at issue." (Judicial Council of Cal., Civ. Jury Instns. (2014) Directions for Use for CACI VF-300, p. 207.)

contract claim and find for Plaintiffs." TDS does not dispute Wang's assertion that question 3 in CACI VF-300 was modified at the time of trial through the agreement of the parties and the trial court.

Having reviewed the special verdict form in its entirety, we determine that the jury's answer of "No" to question 3 ("Did all the conditions that were required for The TDS Group, Inc.'s performance occur or were they excused?") on the special verdict form constitutes the jury's finding that either (1) Wang failed to prove that the conditions required for The TDS Group, Inc.'s performance of the parties' contract had occurred; or (2) Wang failed to prove that the conditions required for TDS's performance of the parties' contract were excused.

Thus, by answering "No" to question 3, the jury found that Wang had not proven an essential element of her breach of contract claim. "It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance. [Citation.] Similarly, where defendant's duty to perform under the contract is conditioned on the happening of some event, the plaintiff must prove the event transpired. [Citation.]" (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 380 (*Consolidated World Investments*).)

The jury's "No" answer to question 3 ("Did all the conditions that were required for The TDS Group, Inc.'s performance occur or were they excused?") was therefore inconsistent with the jury's "Yes" answers to question 4 ("Did The TDS Group, Inc. fail to do something that the contract required it to do?") and question 5 ("Were Ya Hui (Emily) Wang and Chun Yu, Inc. harmed by that failure?"), as well as its "$4,218,033" answer to question 6 ("What are Ya Hui (Emily) Wang and Chen Yu, Inc.'s damages?").

In other words, the jury made the following inconsistent findings: (1) Wang had failed to prove all elements of the breach of contract cause of action because she did not proved that the conditions required for The TDS Group, Inc.'s performance of the parties' contract had occurred or were excused (question 3), and (2) Wang had proved

19

breach of contract because she proved that TDS failed to do something that the contract required it to do (question 4) and she was harmed by that failure (question 5) in the amount of over $4 million in damages (question 6).

Since we may not choose between inconsistent answers in a special verdict (*City of San Diego*, *supra*, 126 Cal.App.4th at p. 682), and we may not infer findings in support of Wang as the prevailing party (*Zagami*, *supra*, 160 Cal.App.4th at p. 1092), we find that the special verdict on breach of contract is against the law due to the inconsistent special verdict. (§ 657, subd. (6); see *Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1185-1186 (*Lambert*).) Although the trial court did not expressly state that a ground for its order granting TDS's motion for new trial on the breach of contract claim was that the special verdict on breach of contract was against law, we may affirm the order on this ground because it was raised in TDS's motion. (See *Don v. Cruz* (1982) 131 Cal.App.3d 695, 706.)

Wang's contention that TDS waived any defect in the special verdict because TDS failed to object and request that the jury be returned for further deliberation does not persuade us to alter our conclusion. It is well established that "when a complaint is made that verdicts are inconsistent, no objection is required to preserve the issue for appeal. [Citations.]" (*Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154, 187; see also *Lambert*, *supra*, 67 Cal.App.4th at p. 1182.)

Wang also contends that the trial court failed to comply with its duty to interpret the verdict and therefore this court should interpret the verdict correctly in Wang's favor. This contention is also unpersuasive. Wang relies on the decision in *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452 (*Woodcock*), which is factually and legally distinguishable.

In *Woodcock*, the plaintiff was injured in a construction site accident and brought a personal injury action alleging that the defendant scaffolding company was negligent. (*Woodcock*, *supra*, 69 Cal.2d at p. 454.) The jury rendered a general verdict of $13,000

20

with the special finding that the negligence of defendant scaffolding company was a proximate cause of the plaintiff's injuries. (*Id*. at p. 455.) On appeal, the defendant argued that the trial court had erred in denying its request that judgment be reduced by the amount of the worker's compensation benefits that the plaintiff had received. (*Ibid*.) The California Supreme Court found that the verdict was "ambiguous in not specifying whether the $13,000 represents the gross or net amount of damages." (*Id*. at p. 456.)

To resolve the ambiguous verdict, the *Woodcock* court applied the following rules: " 'If the verdict is ambiguous the party adversely affected should request a more formal and certain verdict. . . .' [Citations.] But where no objection is made before the jury is discharged, it falls to 'the trial judge to interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.' [Citations.] Where the trial judge does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct interpretation. [Citations.] If the verdict is hopelessly ambiguous, a reversal is required, although retrial may be limited to the issue of damages. [Citations.]" (*Woodcock*, *supra*, 69 Cal.2d at pp. 456-457, fn. omitted.) The court determined that when the verdict was considered in light of the instructions to the jury to award the full amount of damages without subtraction for the worker's compensation claim, the verdict was unambiguous and the judgment should be reduced in the amount of the worker's compensation benefits previously paid. (*Id.* at p. 459; see also *Lambert*, *supra*, 67 Cal.App.4th at p. 1183 [the first principle of inconsistent general and special verdicts is that they must be harmonized if possible].)

Thus, the rules stated in *Woodcock* and *Lambert* regarding the court's duty to interpret an ambiguous verdict apply to inconsistencies between a general verdict with special findings or between a general verdict and special verdicts. These rules have no application in the present case because the jury rendered a special verdict on the breach of contract cause of action, not a general verdict with special findings or a general verdict with special verdicts. (See *Mendoza*, *supra*, 81 Cal.App.4th at pp. 302-303.) As we have

21

noted, where the inconsistency is between the answers to questions in a special verdict, there is no "presumption in favor of upholding a special verdict. Rather, a special verdict's correctness must be analyzed as a matter of law. [Citation.] This is because a special verdict is far more susceptible to defect than a general verdict, which can be tested with special findings. [Citation.]" (*Id*. at p. 303.) Thus, where, as here, the inconsistency is between the answers to special verdict questions, the court does not have a duty to reconcile the inconsistencies and interpret the verdict. (*Id*. at p. 302.)

Having reached the conclusion that the special verdict on breach of contract is against the law within the meaning of section 657, subdivision (6) due the inconsistency in the jury's answer to question 3 and the answers to questions 4, 5, and 6 of the special verdict, we will affirm the order granting a new trial on the breach of contract cause of action. Having reached that conclusion, we need not address the other issues raised on appeal with respect to the merits of the August 16, 2012 order granting TDS's motion for new trial on the breach of contract cause of action.

**D.** *Motion for Judgment Notwithstanding the Verdict*

Wang contends that the trial court erred in granting TDS's motion for judgment notwithstanding the verdict on the tort causes of action for intentional interference with prospective economic relations and intentional interference with contractual relations because substantial evidence supports the jury's findings on those claims.

As a threshold matter, we consider whether the August 14, 2012 order granting in part TDS's motion for judgment notwithstanding the verdict is appealable. Wang argues that the order is reviewable on appeal from the August 16, 2012 order granting a new trial on the breach of contract cause of action, pursuant to section 906 and the decision in *Beavers v. Allstate Ins. Co*. (1990) 225 Cal.App.3d 310, 330 (*Beavers*). We disagree.

The California Supreme Court has instructed that "an order granting judgment notwithstanding the verdict, . . . is but a step preliminary to final judgment and not an appealable order. [Citation.]" (*Jordan v. Talbot* (1961) 55 Cal.2d 597, 602; see also

*Cobb v. University of So. California* (1995) 32 Cal.App.4th 798, 804 (*Cobb*) [order granting partial judgment notwithstanding the verdict is not listed in section 904.1 and is not appealable].)

In *Beavers*, the appellate court explained that "[a]n order granting partial judgment notwithstanding the verdict has the effect of modifying the judgment on the verdict. If the trial court otherwise upholds the verdict, then the judgment, as modified by the partial judgment notwithstanding the verdict, is immediately appealable. Where, however, the trial court grants a new trial as to issues which are not affected by the judgment notwithstanding the verdict, then the new trial order must be held to have the effect of vacating and holding in abeyance the entire judgment, as modified by the order granting judgment notwithstanding the verdict, until one final judgment can be entered." (*Beavers*, *supra*, 225 Cal.App.3d at p. 330.)

The *Beavers* court also determined that there was an exception to the rule "that a partial new trial order vacates and holds in abeyance the entire judgment." (*Beavers*, *supra,* 225 Cal.App.3d at p. 330.) "The exception occurs when the judgment retains sufficient vitality to support appellate review if the matter is otherwise properly brought before the appellate court. . . ." (*Ibid.*) This exception applied in *Beavers* because the trial court had "granted partial judgment notwithstanding the verdict and granted a new trial as an alternative to the partial judgment notwithstanding the verdict and as to all other issues." (*Ibid*.)

The decision in *Beavers* is distinguishable from the present case. Unlike the trial court in *Beavers*, the trial court here did not grant a new trial on all issues as an alternative to the partial judgment notwithstanding the verdict. (See *Beavers*, *supra*, 225 Cal.App.3d at p. 330.) Instead, the trial court in the present case granted partial judgment notwithstanding the verdict as to the two tort causes of action and granted a new trial on the separate breach of contract cause of action. Consequently, our affirmance of the partial new trial order has the effect of vacating and holding in

23

abeyance the entire judgment until one final judgment can be entered. (See *Ibid*.) "Any issue concerning the order granting partial judgment notwithstanding the verdict can be reviewed by the filing of a petition for extraordinary relief[8] [citation] or once a final judgment is entered. [Citations.]" (*Cobb*, *supra*, 32 Cal.App.4th at p. 804.)

We are also not convinced that section 906 provides that a partial judgment notwithstanding the verdict is immediately appealable. Section 906 provides in part: "Upon an appeal pursuant to Section 904.1 or 904.2, the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party, including, on any appeal from the judgment, any order on motion for a new trial, and may affirm, reverse or modify any judgment or order appealed from and may direct the proper judgment or order to be entered, and may, if necessary or proper, direct a new trial or further proceedings to be had."

Under section 906, "appellate review following a final judgment properly encompasses 'any intermediate ruling, proceeding, order or decision' of the trial court that 'involves the merits' or 'necessarily affects' the judgment or 'substantially affects the rights of a party . . . .' [Citations.]" (*Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 648-649.) However, "nonappealable orders or other decisions substantively and/or procedurally collateral to, and not directly related to, the judgment or order being appealed are not reviewable pursuant to section 906 even though they

---

[8] Wang has not requested that we exercise our discretion to treat the nonappealable partial judgment notwithstanding the verdict as a petition for an extraordinary writ. (*Olson v. Cory* (1983) 35 Cal.3d 390, 400-401.) We may not exercise that power except "under extraordinary circumstances, ' "compelling enough to indicate the propriety of a petition for writ . . . in the first instance . . . ." [Citation.]' " (*Estate of Weber* (1991) 229 Cal.App.3d 22, 25.) Our review of the record does not reveal such extraordinary circumstances in the present case, where Wang has an appellate remedy.

literally may 'substantially affect[ ]' one of the parties to the appeal." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 948.)

In the present case, we determine that the order granting partial judgment notwithstanding the verdict on the tort causes of action does not involve the merits of the partial new trial order on the breach of contract cause of action, does not necessarily affect the partial new trial order, and is not directly related to the partial new trial order. (See *Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 751 [motion for a new trial has a different purpose and different standard of review than a motion for judgment notwithstanding the verdict].) Therefore, section 906 does not support Wang's contention that the August 14, 2014 order granting partial judgment notwithstanding the verdict is reviewable in this appeal.

Accordingly, we conclude that the August 14, 2012 order granting TDS's motion for judgment notwithstanding the verdict on the causes of action for intentional interference with prospective economic relations and intentional interference with contractual relations is not immediately appealable. For that reason, we will dismiss the appeal from the August 14, 2012 order without reaching Wang's contentions regarding the merits of the order. (See *Cobb*, *supra*, 32 Cal.App.4th at p. 804.)

### IV. CROSS-APPEAL

#### A. *Order Denying Motion for Judgment Notwithstanding the Verdict*

TDS has filed a cross-appeal in which it seeks review of the August 14, 2012 order denying TDS's motion for judgment notwithstanding the verdict on the breach of contract cause of action.

Our standard of review is well established. "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] The moving party may appeal from the judgment or

25

from the order denying the motion for judgment notwithstanding the verdict, or both. (. . . § 904.1, subd. (a)(4) [making such an order appealable].)  As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion.  [Citations.]"  (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)  "If the motion presents a legal question based on undisputed facts, however, we review the ruling de novo.  [Citation.]"  (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1043-1044.)

### 1.  Question 3

In its cross-appeal, TDS contends that the jury's answer of "No" to question 3 of the special verdict on breach of contract defeated an essential element of the cause of action and therefore compels entry of judgment in TDS's favor on the breach of contract cause of action.

We reject this contention because, as we have discussed, the jury's answer of "No" to question 3 ("Did all the conditions that were required for The TDS Group, Inc.'s performance occur or were they excused?")  of the special verdict on breach of contract in TDS's favor was inconsistent with the jury's answers to questions 4, 5, and 6 in Wang's favor.  We may not choose between inconsistent answers in a special verdict (*City of San Diego*, *supra*, 126 Cal.App.4th at p. 682) and we may not infer findings in support of TDS (*Zagami*, *supra*, 160 Cal.App.4th at p. 1092).  Therefore, TDS is not entitled to judgment notwithstanding the verdict on breach of contract on the ground of the answer of "No" to question 3.

### 2.  Ambiguity

We understand TDS to also contend that the trial court should have granted its motion for judgment notwithstanding the verdict on the breach of contract cause of action on the ground that the parties' settlement agreements unambiguously incorporated the terms of the trademark license agreement, which TDS argues provided that Wang could

26

be terminated at will on 30 days' notice and that she was not entitled to consequential damages.

Wang responds that TDS has failed to meet its burden to show that there is no substantial evidence to support the verdict. She also argues that the evidence shows to the contrary that the parties did not intend the trademark agreement to apply to the settlement agreements.

The record reflects that during motions in limine the trial court denied TDS's request for reconsideration of the court's in-chambers ruling that the parties' agreements were ambiguous. The court stated: "I just believe that there are unanswered questions. The agreements are ambiguous as far as I'm concerned. I just don't believe that a party would knowingly enter into a contract that could be terminated with such . . . important provisions, that that could just disappear in 30 days. . . . [W]e need evidence on what the parties really intended."

Where an issue is raised on appeal as to whether the parties' contract is ambiguous, we apply the following standard of review. "The analysis of whether an ambiguity exists is not limited to the words of the contract. [Citation.] Trial courts are required to receive provisionally any proffered parol evidence that is relevant to show whether the contractual language is reasonably susceptible to a particular meaning. [Citations.] Such parol evidence might expose a latent ambiguity when the contract appears unambiguous on its face. [Citation.] [¶] Similarly, an appellate court must consider the proffered parol evidence when conducting its independent review into whether an ambiguity exists. [Citation.] In other words, appellate courts evaluate the instrument's language and relevant extrinsic evidence and decide whether, in light of the extrinsic evidence, the language is reasonably susceptible to the competing interpretations urged by the parties. [Citation.]" (*Adams v. MHC Colony Park L.P.* (2014) 224 Cal.App.4th 601, 620, fn. omitted.) "If the interpretation of the contract turns upon the credibility of extrinsic evidence, the interpretation of the contract is not a

27

question of law, but one of fact and it will not be overturned unless not supported by substantial evidence. [Citations.]" (*LaCount v. Hensel Phelps Constr. Co.* (1978) 79 Cal.App.3d 754, 770 (*LaCount*).) In accordance with this standard of review, we have reviewed the 2007 settlement agreement, the 2008 settlement agreement, the trademark license agreement, and the related extrinsic evidence that was presented at trial.

The unsigned and undated trademark license agreement between TDS and Wang that is included in the record on appeal includes a 30-day termination term: "This Agreement may be terminated, without penalty, upon at least thirty (30) days written notice by either party." The trademark license agreement also provides that "[n]either party shall have the right to seek or obtain consequential, special or punitive damages on account of the failure of the other party to perform or observe any covenant or obligation under this Agreement on their part to be performed or observed."

The 2007 settlement agreement includes the following term regarding the trademark license agreement: "TDS agrees to a future working relationship with Emily Wang provided Emily Wang executes the Nonexclusive Trademark License Agreement attached hereto as Exhibit A, and the Registered Representative's Selling Agreement attached hereto as Exhibit B, and these agreements shall govern the working relationship between Emily Wang and TDS." However, Wang testified that she never received a copy of the trademark license agreement, was never asked to sign it, and began a working relationship with TDS without ever signing it.

The 2008 settlement agreement states, with regard to prior agreements, that "[i]n addition to the terms and conditions set forth herein, TDS will perform the terms and conditions set forth in the Settlement Agreement And Mutual Release Of All Claims entered by and between TDS and Wang et al. on or about October 26, 2007, a copy of which is attached hereto as Exhibit 'I' and incorporated by reference herein."

As to the trademark license agreement, the 2008 settlement agreement contains two references, which state in part: (1) "TDS agrees that, upon termination of the Non

28

Exclusive Trademark and Marketing License Agreement, Emily Wang has the right to transfer her book of business . . . directly to Pension Planners."; and (2) "Emily Wang may transfer her rights and obligations under the Nonexclusive Trademark License Agreement to a corporation or LLC in which she is the sole shareholder/member."

Wang's attorney testified that when he negotiated the 2008 settlement agreement there were no discussions with TDS regarding whether the trademark licensing agreement would control the termination of the parties' rights under the settlement agreement. Abdahla also recalled that TDS never asked Wang to execute the trademark license agreement that was attached to the 2008 settlement agreement.

Based on our review of the parties' agreements and the related extrinsic evidence, we determine that the trial court did not err in impliedly ruling that the parties' agreements are ambiguous with respect to (1) the incorporation of the terms of the trademark license agreement, and (2) whether the parties had agreed that Wang could be terminated at will on 30 days' notice and was not entitled to consequential damages.

In particular, we observe that the 2008 settlement agreement expressly provided that TDS would perform under the 2007 settlement agreement, not Wang. Also, the 2008 settlement agreement was silent as to the purported incorporation of the trademark license agreement. Neither the 2007 settlement agreement nor the 2008 settlement agreement expressly provided that Wang could be terminated at will on 30 days' notice and was not entitled to consequential damages. At trial, Wang and her attorney testified that they did not agree that these trademark license agreement terms would be incorporated in the subsequent settlement agreements. Their testimony constitutes substantial evidence of a reasonable contract interpretation—Wang did not agree that the terms of the trademark license agreement regarding termination and consequential damages were incorporated in the settlement agreements—that is different than TDS's interpretation, and which we may not overturn on appeal. We reiterate that where, as here, "the interpretation of the contract turns upon the credibility of extrinsic evidence,

29

the interpretation of the contract is not a question of law, but one of fact and it will not be overturned unless not supported by substantial evidence. [Citations.]" (*LaCount*, *supra*, 79 Cal.App.3d at p. 770.)

### 3. Duration of Contract

Finally, TDS contends that its motion for judgment notwithstanding the verdict on the breach of contract cause of action should have been granted because Wang failed to prove the essential contract term of the duration of the parties' settlement agreements. Wang disagrees, arguing that TDS failed to request a jury instruction asking the jurors to determine the duration of the settlement agreement. We determine that TDS has forfeited this issue by failing to raise it during the trial proceedings.

A party may not withhold a theory from the jury by failing to request jury instructions "and . . . obtain appellate review of the evidence and reversal of the judgment on a theory never tendered (or tendered in a different form) to the jury." (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535.) Moreover, a party may not present a new theory for the first time in posttrial motions unless the theory constitutes a question of law based on undisputed facts. (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653-1654 (*Stevens*).)

The issue of whether a contract is fatally defective because it lacks an express term of duration may not be resolved as a question of law absent undisputed facts. "In construing contracts which call for continuing performance or forbearance but which contain no *express* term of duration, it is first necessary to determine whether the intention of the parties as to duration can be *implied* from the nature of the contract and the circumstances surrounding it. [Citations.]" (*Consolidated Theatres, Inc. v. Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 725.) "[I]n some cases the nature of the contract and the totality of surrounding circumstances give no suggestion as to any ascertainable term. In such cases the law usually implies that the term of duration shall be at least a reasonable time. . . ." (*Id*. at pp. 727-728, fn. omitted.) "What

constitutes a 'reasonable time' for performance is a question of fact. [Citation.]" (*Consolidated World Investments, supra,* 9 Cal.App.4th at p. 381.)

Here, the record shows that the factual question of the duration of the parties' agreements was not presented by TDS during the trial proceedings. The jury was not instructed to determine whether the agreements included a term regarding duration and the special verdict form did not request a finding on the contract's duration. Moreover, TDS did not assert that the parties' settlement agreements lacked an essential term of duration of the contract until it filed its motion for judgment notwithstanding the verdict. Since TDS failed to tender the duration of contract theory to the jury, and in the absence of any undisputed facts regarding duration, we determine that TDS has forfeited the issue on appeal. (See *Stevens*, *supra*, 49 Cal.App.4th at pp. 1653-1654.)

For these reasons, we will affirm that part of the August 14, 2012 order denying TDS's motion for judgment notwithstanding the verdict on the breach of contract cause of action.

## B. *Order Denying Motion for New Trial*

TDS has filed a protective cross-appeal from the trial court's August 16, 2012 order denying TDS's motion for new trial on the tort causes of action for intentional interference with prospective economic relations and intentional interference with contractual relations, as a precautionary measure in the event that Wang prevailed on her appeal from the trial court's order granting TDS's motion for judgment notwithstanding the verdict on the tort causes of action.

Since we have concluded that the August 14, 2012 order granting in part TDS's motion for judgment notwithstanding the verdict is not immediately appealable and we will dismiss the appeal from the August 14, 2012 order, we further conclude that TDS's protective cross-appeal is moot.

31

## V. DISPOSITION

The August 16, 2014 order granting a new trial on the cause of action for breach of contract is affirmed. Wang's appeal from the August 14, 2012 order granting TDS's motion for judgment notwithstanding the verdict on the causes of action for intentional interference with prospective economic relations and intentional interference with contractual relations is dismissed. The August 14, 2012 order denying TDS's motion for judgment notwithstanding the verdict on the breach of contract cause of action is affirmed. TDS's protective cross-appeal from the August 16, 2012 order denying TDS's motion for new trial on the causes of action for intentional interference with prospective economic relations and intentional interference with contractual relations is dismissed as moot. The parties are to bear their own costs on appeal.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.